# NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| Eloise K. Hahn, P.E., R.E.M. ) <br> Plantiff ) <br> ) <br> V. ) <br> ) <br> ) <br> ) <br> US EPA Region 5 et. al. ) <br> ) <br> Peter Swenson, Chief ) <br> NPDES Programs Branch ) <br> USEPA Region 5 ) <br> ) <br> Alan Nudelman ) <br> Water Division, US EPA Region 5 ) <br> ) <br> Tinka Hyde, Acting Director ) <br> Water Division, US EPA Region 5 ) <br> Defendants | CASE NUMBER: 08C3433 <br><br> ASSIGNED JUDGE: <br> Judge Coar <br><br> DESIGNATED <br> MAJISTRATE JUDGE: <br> Judge Cole <br><br> **F I L E D** <br><br> AUG 1 4 2008 <br> 8-14-2008 <br> MICHAEL W. DOBBINS <br> CLERK, U.S. DISTRICT COURT |

## EMERGENCY AMENDED COMPLAINT FOR EMPLOYMENT DISCRIMINATION, PROPOSED WRONGFUL TERMINATION ANHD PETITION FOR DAMAGES

1. This is an action of employment discrimination, proposed wrongful termination and petition for damages.

2. The Plantiff in this matter is Eloise K. Hahn, P.E., R.E.M., of the County of Cook in the State of Illinois.

-2-

3.   That the Plantiff has been employed as a Federal civilian public

     servant since June 7, 1989.

4.   That the Plantiff was initially employed at the Rock Island

     Arsenal as a General Engineer for the Department of the

     Army, in the U.S. Armament, Munitions and Chemical

     Command.

5.   That the Plantiff was employed as a configuration manager

     for assigned chemical defense decontamination kits where

     she provided engineering support to contractors for

     critical manufacturing processes.

6.   That Plantiff resigned from her position at the Rock Island

     Arsenal due to pregnancy, however, she was reinstated

     for full time Federal civilian employment with the United

     States Environmental Protection Agency, Region 5 sometime in

     May of 1990 where she was initially employed as an Environmental

     Engineer in the Office of Compliance and Enforcement in the

     Water Division.

7.   That Plantiff has over nineteen (19) years of Federal civilian

     service currently and is eligible to receive pension benefits

-3-

when she turns 56 years of age.  The Plantiff is currently 54.5
years old.

8.  That Plaintiff currently is employed at the U.S. EPA Region 5
    NPDES Programs Branch as an Environmental Engineer
    GS-819, Step 8.

9.  That the Plantiff has always successfully passed her
    Annual Performance Evaluations for over 19 years currently.

10.  That Plantiff has been served a "Proposed Notice of
    Termination", effective May 2, 2008, by Tinka Hyde, Acting
    Water Division Director, a copy of which is attached in Exhibit A.

11.  That the Acting Administrator, Bharat Mathur, has consulted
    with Plaintiff , the Union's Vice President of Pofessionals
    namely Jeffrey Bratko and Martin Mills, Labor Relations
    Personnel Specialist on June 4, 2008, with respect to the termination.
    The Plaintiff is awaiting his decision for termination based on the
    Union and her written response on why she should not be terminated,
    however, the Director of Civil Rights at the US EPA Region 5 office
    has advised the Plaintiff that it is the intention of the Acting
    Adminstrator to terminate Plaintiff without a pension, benefits and/or

-4-

transfer to another FederalAgency.  A copy of the Plantiff and
Union's written response to the proposed termination is hereby \
attached in Exhibit B.

12.   That the Acting Administrator, Bharat Mathur, has committed
an infracture of labor law practices when he wrongfully suspended the
Plantiff last July of 2007 attributing to the Plantiff  taking out a
hardship loan in excess of $4,000 in her 401(k) account attributing to
loss of principal and the ability to contribute to her TSP retirement
account for a period of 6 months, including the loss of the Federal 5%
match contribution.

13.   That Plantiff has consulted with the Office of Civil Rights
at the US EPA Region 5 office on April 25 and May 8, 2008.

14.   That the Office of Civil Rights has issued Plantiff a "Notice
of Right to Sue", effective June 5, 2008.  A copy of the Notice
of the Right to Sue Memorandum is hereto attached in Exhibit
C.

15.   That Plantiff believes the Defendant, Tinka Hyde, is not
qualified to act in her present position, Acting Director for the
Water Division at US EPA Region 5 which is detailed in the

-5-

Plantiff and Union's written response to the Acting Administrator

Bharat Mathur, dated June 4, 2008.

16.    That Plantiff has also been informed that the current

Acting Administrator may be having an extra mjarital affair with a

with a supervisor employed at the US EPA Region 5.

Consequently, Plantiff has little or no faith that the Acting

Administrator has any respect for moral and ethical

practices attributing to poor judgment and infractures of fair

labor law statutes.

17.    The Plantiff has filed charges against the Defendants asserting

the acts of discrimination indicated in this Complaint with the

United States EPA Regional Civil Rights Office on March

27, April 25 and May 2 of 2008.

18.    A copy of the EEOC Counselor's Initial Interview Charges

were filed with the Honorable Judge Coar's Deputy Clerk

on May 13, 2008, Case No. 08 C 2333.  The Honorable

Judge Coar dismissed the case without prejudice since

Plantiff had not included a Notice of the Right to Sue.

19.    The United States Environmental Protection Office, Region 5,

-6-

Civil Rights office has served the Plantiff a "Notice of the Right to Sue" effective June 5, 2008, a copy of which is hereto attached in Exhibit C.

20.   That the Plantiff feels the Defendants have discriminated against because of Plantiff's:

    (a) Age (Age Discrimination Act);

    (b) Disability (Americans with Disabilities Act);

    (c) National Origin (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. Section 1981);

    (d) Marital Status;

    (e) Sex (Title VII of the Civil Rights Act of 1964);

    (f) Non-equal pay;

    (g) Non-equal benefits;

    (h) Sexual harassment;

    (i) Harrassment;

    (j) No reasonable accommodations in the workplace;

    (k) Retaliation;

    (l) Creating a hostile work environment while Plantiff is on duty status;

    (m) Denial of Plantiff's civil liberties to use the restroom;

-7-

(n)  Denial of the freedom of speech to communicate amongst her colleagues;

(o)  Denial of flexi-place privileges; and

(p)  Deformation of character.

21.  That the Plantiff is suing the Defendants for discrimination on the basis of national origin, age, marital status, sex, sexual harassment, harassment, non-equal pay and benefits, disabilities, refusal to provide reasonable accommodations, creation of a hostile workplace environment, freedom of speech, denial to use restroom and telephone in emergencies, a false arrest, infracture of Labor Law statutes and standards, slander and retaliation.

22.  Jurisdiction over the statutory violations alleged is conferred as follows:  over Title VII claims by 28 U.S.C. Section 1331, 28 U.S.C. Section 1343(a) and 42 U.S.C. Section 2000e-5(f)(3); over 42 U.S.C. Section 1981 and Section 1983 by 42 U.S.C. Section 1988; over the A.D.E.A. by 42 U.S.C. Section 12117.

23.  That the Plantiff requests a jury trial in resolving this case unless settlement can be reached amongst the opposing parties.

24.  That the Plantiff further requests an appeal to the Merit

-8-

Systems Protection Board ("MSPB") in the event of an adverse

verdict upon the Plantiff.

25.   The allegations supporting the Plantiff's complaints for

employment discrimination, proposed wrongful termination

and claims for damages are as follows:

## **COMPLAINT FOR DAMAGES**

### Count 1

1.   That Plantiff suffers from hypothyroidism, diabetes,

high cholesterol, sleeping disorder and gingivitis of the gums

and teeth.

2.   That Plantiff's physical and mental impairments require Plantiff

to undergo periodic medical examinations to maintain her

health.

3.   That the Defendant, Peter Swenson, Plantiff's immediate

supervisor has falsely alleged the Plantiff has time and

attendance problems on April 28, 2008, as documented in the

Supervisor's Statement hereto attached in Exhibit D.

The Defendant, Peter Swenson, has alleged the Plantiff

has time and attendance problems since she took 45 hours

-9-

of paid annual leave since January 1, 2008, to the present
and approximately 20 hours of paid advanced sick leave.

4.  That Plantiff's benefits based on her length of service allow
her to take up to 7 weeks off a year for both annual and sick
leave.

5.  That the Defendant, Peter Swenson, intentionally
has discriminated and harassed Plantiff due to her
medical disabilities in order to knowingly and wrongfully
terminate Plantiff.

6.  That the Defendant, Peter Swenson's, malicious sanctions
and allegations against the Plantiff have attributed to
extreme mental cruelty and anguish, including
expensive medical expenditures for neglect of Plantiff's
physical and mental health.

WHEREFORE Plantiff respectfully prays the court for judgment
against the Defendant, Peter Swenson, in the amount of $1,000,000 for
proposing to terminate the Plantiff's employment prematurely of about ten
years, including $1,200,000 for lost retirement benefits that Plantiff would
have received if Plantiff is unjustly discriminated and wrongfully terminated

-10-

due to Plantiff's disabilities.

Count II

COMES NOW Plantiff, pro se, and for her cause of action alleges and says:

1.   That the contents of Count 1, paragraphs 1-6 are incorporated herein and made a part hereof.

2.   That the Defendants, Peter Swenson and Alan Nudelman have intimidated, harassed, defamed and falsely accused malicious allegations against the Plantiff in order to demean the Plantiff's reputation to such an extent that she is now required to take valium and seroquel (sleeping pills) to get her sleep nightly.

3.   That the Defendant, Alan Nudelman, contacted Homeland Security on May 22, 2007, when the Plantiff was suffering from cardiomegaly and from an acutely broken rib requiring pain killers.  The Defendant, Alan Nudelman, was instructed by the US EPA counsel to take the Plantiff immediately to the hospital.  The Defendant, Alan Nudelman, disobeyed counsel's instructions and falsely accused Plantiff slapping his hand attributing to Homeland Security arresting the Plantiff where she was thrown into an underground prison in the

-11-

IRS building for approximately six hours. The incarceration
further endangered Plantiff's life since she was chained to a bench
where her broken rib cage was exposed to more hazards for physical
injury. Only after Plantiff screamed for her life because she was
having a hard time to breathe did Homeland Security consider her
imminent medical attention and take Plantiff to the Northwestern
Hospital's Emergency Room. Plantiff recalls Homeland Security
gossiping about Plantiff citing, "Do you think we should have locked
her up after all she is an Environmental Engineer".

4. At approximately 8:00 p.m. on May 22, 2007, Plantiff was
thrown into a police van attributing to her eyeglasses getting
demolished, i.e., to replace the glasses attributed to a $700
expenditure.

5. When Plantiff arrived at the emergency room she was
restrained with handcuffs to the hospital bed due to
trauma. Additionally, without the Plantiff's consent she was
injected with a lethal drug without Plantiff's permission.
Plantiff immediately contacted her daughter and nephew and
instructed them to come to the emergency room immediately.

-12-

Plantiff's daughter and nephew were instructed by the hospital

to return to the hospital sometime after midnight contingent

on obtaining an x-ray of Plantiff's chest. The findings were that

Plantiff may have been suffering from an abnormal infiltrate,

however, Oak Park Hospital's findings were that Plantiff was

suffering from an acutely broken rib and cardiomegaly, as

evidenced by the attached hospital report hereto attached in

Exhibit E. The Plaintiff arrived to her residence approximately at 2:00

a.m. on May 23, 2007.

6.     That Plantiff's daughter advised the Northwestern Hospital staff

that Plaintiff was not acting any differently than she had for

the past 16 years, except her mother appeared traumatized.

7.     That Plantiff's nephew was enraged with the false arrest,

mental anguish and cruelty, and physical suffering Plantiff

had experienced through this traumatic event.

8..     That Homeland Security required Plantiff to pay approximately

$500 for the false arrest.

9.     That the Defendant, Alan Nudelman, continues to harass, defame and

intimidate Plantiff.

-13-

10. That the Defendant, Alan Nudelman, recently verbally attacked the Plantiff by calling her "a piece of scum".

11. That Plaintiff requested the Defendant, Alan Nudelman, to apologize, particularly since Plantiff's two children have recently graduated as "Summa Cum Laude" graduates, being the top 1% of their graduating class.

12. That the Defendant, Alan Nudelman, refused to apologize and threatened the Plantiff's job by alleging the Plantiff be required to blow into a breath analyzer at her desk alleging the Plantiff being intoxicated at the workplace.

WHEREFORE, the Plaintiff prays to this honorable court for a hearing and jury trial in order that she be able to supeona Homeland Security in providing her a copy of the video tape incidence, as well as, expunge this incidence from Plantiff's employment file and compensate her for the $1,200 aforementioned expenditures, in addition to her medical expenditures she endured for this false arrest.

Count III

COMES NOW Plantiff, pro se, and for her cause of action alleges and says:

-14-

1.  That the contents of Count I, paragraphs 1-6, are incorporated

    herein and the contents of Count II, paragraphs 1-12 are incorporated

    herein.

2.  That on March 6, 2008, Plantiff took her lunch from 11:35 a.m.

    to 12:05 p.m. After lunch Plantiff proceeded to the restroom

    to brush her teeth, powder her nose and use the toilet. When

    she returned to her desk at 12:35 p.m. Plantiff was falsely

    accused of an unexcused absence whereby the Defendant,

    Mr. Swenson, recommended to the Acting Water Division

    Director, Tinka Hyde, that the Plantiff be terminated for

    using the restroom after her lunch break. Additionally, the

    Defendant, Mr. Swenson, falsely accused Plantiff of misuse

    of government equipment when she contacted her son

    regarding his graduation ceremony so that she could make travel

    plans to see her son graduate from the University of Alabama

    on May 10, 2008. Further, at approximately 3:30 p.m. that afternoon

    Plantiff took her 15 minute break to go to her car and get some vital

    paperwork and her blood sugar monitoring kit that Plantiff needed to

    continue her work that day. When Plantiff was at the garage, the

-15-

Defendants, Peter Swenson and Alan Nudelman, followed her and alleged Plantiff was absent without leave. Finally, Mr. Swenson grabbed Plantiff's car keys and threw her body into his car as if she was being kidnapped. The Defendant, Mr. Nudelman, stole Plantiff's car keys and kept moving her vechicle throughout the garage so Plantiff could not escape from Mr. Swenson's vechicle.
The Plantiff was concerned she would be confronted with sexual harassment by being incarcerated in the Defendant's, Peter Swenson's vechicle. The Defendant, Peter Swenson insisted to incarcerate Plantiff in his automobile instead of allowing Plantiff to call her immediate family to rescue her and take her to her Berwyn residence. Instead the Defendant, Peter Swenson, insisted on driving the Plantiff fifty (50) miles to Chesterton, Indiana where the Plantiff had promised a contractor that she be present at her relative's home to repair their furnance on March 7, 2008.

3.   Plantiff requested both Defendants, Alan Nudelman and Peter Swenson, if she could obtain her blood sugar testing kit. They both refused attributing to Plantiff's confusion as she believes she was suffering from low blood sugar.

-16-

4.    On March 7, 2008, Plantiff had to incur a $15.00 taxi charge

to get to the South Shore train and go back to Chicago to

get her keys from Mr. Nudelman.

WHEREFORE, Plantiff respectfully requests statutory damages

against the Defendants, Alan Nudelman and Peter Swenson, for sexual

harassment and/or harassment including punitive damages and costs in that

the Defendants, Alan Nudelman and Peter Swenson, are attempting to

terminate the Plantiff unjustly for Plantiff taking a break and wanting to test

her blood sugar and for all other just and proper relief in the premises.

### Count IV

1.    That the contents of Count I, paragraphs 1-6 are incorporated herein

and the Contents of Count II, paragraphs 1-12, including the Contents

of Count III, paragraphs 1-4 are incorporated herein.

2.    That Plantiff has been accused by the Defendants of misuse of her

travel card from Morgan Chase.

3.    That the Plantiff denies misuse of the travel card as all balances are

paid in full and were timely.  Further, Plantiff was advised by the

Morgan Chase personnel that the previous administrator

had approved Plantiff to use the travel card for any and all food

expenditures incurred that were work related, including gas to do her

mission for the U.S. EPA Regional office both on or off travel. In

addition the bank had advised Plantiff she was allowed to use the card

to buy her medications in an emergency and other incidentals.

4.    That the Plantiff 's last previous trips was one trip to Minnesota in

2002 and two trips in 2007 to Minnesota and Michigan.

5.    That when Plantiff was engaged as a full time Environmental

Engineer and Enforcement officer in the Compliance and

Enforcement Section of the Water Division Plantiff traveled

frequently and never was prosecuted for any misuse.

5.    Plantiff affirmatively states that she was instructed to use the

travel card for expenditures attributed for Plantiff to accomplish her

mission for the USEPA Region 5. Plantiff apologizes if the

USEPA believes she knowingly used the credit card illegally since

the bank had advised her differently.

WHEREFORE  Plantiff respectfully prays to the court for a

court appointed attorney, a hearing, discovery, jury trial and appeal

to the MSPB in the event of an adverse jury verdict. Plantiff also

prays to this honorable court that she be granted the right to supeona

Morgan Chase telephonic tapes with respect to conversations with the

-17-

Plantiff and bank personnel, a supeona to obtain the video tape of Plantiff's

incarceration in the IRS jail on May 22, 2007 and for $2,200,000

in monetary funds for punitive damages to the Plantifff and all other just

and proper relief in the premise, including a disability retirement pension

if the termination occurs.  Finally, the Plantiff prays to this honorable

court for an Order for the following:

a) To "Stay all Matters", concerning the proposed termination

   until a verdict is rendered from the jury trial and the MSPB,

   if necessary.

b) To direct the Defendants to withdraw all allegations alleged

   currently to terminate her, including expunging all

   adverse documentation in her personnel file;

c) That the Defendants reinstate her if she is terminated

   and that she receive back-pay for wrongful termination;

d) That the Defendants grant the Plaintiff flexi-place;

e) That the Defendants provide reasonable accomodations to

   Plantiff's disabilities;

f) That the Defendants promote her immediately;

g) That the Defendants quit harassing the Plantiff;

-19-

h)      That the Plantiff be granted appropriate injunctive relief,

lost wages, liquidated/double damages, front pay,

compensatory damages, punitive damages, prejudgment

interest, post-judgment interest, and costs, including

reasonable attorney fees and expert witness fees.

i)      Grant such other relief as the Court and jury find

appropriate, including full disability retirement benefits

if wrongfully terminated.

**Eloise K. Hahn, R.E.M., P.E.**
Eloise Kathleen Hahn
1631 S. Clarence Av., Apt. 1
Berwyn, IL   60402
(708) 484-2169

**EXHIBIT A**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 5
77 WEST JACKSON BOULEVARD
CHICAGO, IL 60604-3590

REPLY TO THE ATTENTION OF: **W-15J**

**MEMORANDUM**

DATE:    May 2, 2008

SUBJECT:    **Notice of Proposed Removal**

FROM:    **Tinka Hyde, Acting Director**
**Water Division**

TO:    **Eloise Hahn**
**Environmental Engineer, GS-0819-12**
**NPDES, Water Division**

      This is a proposal to remove you from your position as Environmental Engineer, GS-0819-12 at U.S. Environmental Protection Agency, Region 5, Chicago, IL. This notice is being proposed under the Office of Personnel Management Regulations, 5 C.F.R. 752, Subpart D. I propose to remove you from your position and from the Federal Service, no sooner than thirty (30) calendar days after the date you receive this notice. This action is taken to promote the efficiency of the Federal Service. It is based on the following charges:

      **Charge 1:** You were on duty while under the influence of alcohol. (This is an offense described in the EPA Conduct and Discipline Order, # 3120.1, dated September 20, 1985. Nature of Offense #4: Offenses related to intoxicants, a. Alcohol-related, (3) Reporting to or being on duty while under the influence of alcohol.)

**Specification:**

On Thursday, March 6, 2008, you reported for your scheduled tour of duty, 8:00 AM to 5:30 PM. Your supervisor, Peter Swenson, observed that you were absent from your work station at about 11:30 AM. You returned to work at about 12:35 PM. You were scheduled for a 30 minute lunch break. When you returned to work, you spoke on the telephone and to co-workers in an unusually loud voice. Mr. Swenson asked you to keep your voice down.

You spoke with a co-worker, Mery Jackson. She described her contact with you as follows: "I could smell liquor on Ellie's Breath - this was because she got right in my face - I quickly moved back. Perhaps the liquor smell was from last night."

At about 3:30 PM, Mr. Swenson left the office and arrived at the 318 S. Federal parking garage. Although you were still expected to be on duty until 5:30 PM, you were at the garage talking with a parking garage employee about getting your car. At this time, Mr. Swenson noticed that

your breath smelled strongly of alcohol, and that you appeared to be intoxicated. He observed that the attendant would not release the car to you.

Mr. Swenson noted you were talking loudly, and repeating yourself frequently, in your conversation with the parking garage attendant. Two policemen arrived. Mr. Swenson asked the police what options they had in this situation as it appeared you were unable to drive safely. He said the police indicated that if you attempted to drive they would have arrested you immediately. Mr. Swenson further reported that the police said that if you did not attempt to drive, they could either let you go home in a cab or take you to medical facility.

Mr. Swenson offered to drive you home to Chesterton, Indiana. You accepted this offer and Mr. Swenson gave you a ride home. During the trip, he stated you were very talkative, repeating yourself frequently. He said your breath smelled of alcohol. He asked you if you had been drinking and you said, no, you'd just had a salad and a 'Long Island' at 10 o'clock with your friend Eva (Ava?).

On March 7, 2008, you spoke to Alan Nudelman, Senior Advisor, for the Water Division. He reported that you told him that you had been celebrating your birthday the previous day and asked him "Don't you get drunk on your birthday?"

These observations by Mr. Swenson, Ms Jackson, and Mr. Nudelman have led me to conclude that on March 6, 2008, you were on duty while under the influence of alcohol.

> **Charge 2:** You were Absent without leave (AWOL). (This is an offense described in the EPA Conduct and Discipline Order, # 3120.1, dated September 20, 1985. Nature of Offense #1: Attendance related offenses, b. Absence without leave (AWOL).)

**Specification:**

On Thursday, March 6, 2008, you reported for work as scheduled. Your tour of duty is from 8:00 AM to 5:30 PM. You left work at sometime before 3:30 PM. You did not notify your supervisor you were leaving, did not ask for leave and did not have leave approved before departing. Your supervisor, Mr. Swenson charged you 2 hours of absence without leave for the afternoon of March 6, 2008.

> **Charge 3:** You repeatedly used your Government Travel Card (GTC) for unauthorized purposes. (This is an offense described in the EPA Conduct and Discipline Order, # 3120.1, dated September 20, 1985. Nature of Offense #11: Using Government property or Government employees in duty status for other than official purposes.)

**Specification:**

Travel records for the period 11/01/2007, through 02/05/2008, indicate your Government Travel Card (GTC) was used for unauthorized purposes on 113 occasions totaling $6825.27 in charges.

The attached chart lists the unauthorized transactions include multiple cash withdrawals and charges when you were not in travel status.

Your supervisor, Peter Swenson, offered you an opportunity to explain the unauthorized transactions. You initially denied that you had used the GTC for purposes not related to official travel. Subsequently, you stated that prior to November, 2007, you had not been on official travel since 2002 and did not understand the rules for credit card use. You also said that a person from your bank told you it was alright for you to use the GTC for commuting to work and for meal charges during the work day and paying for medicine, as long as you repaid the charges. (You did admit to using the GTC for other purposes other than commuting to work and meals during the work day.) You said you were later told by another bank representative that you were not allowed to use the GTC for non-travel expenses under any circumstance, and you subsequently ceased using the card.

All employees sign a Memorandum of Understanding to receive the GTC that clearly states that it is to be used solely for expenses incurred for officially authorized government travel. Personal use of the card under any circumstance is specifically prohibited including ATM withdrawals without an approved travel authorization. Having been issued a GTC, you had the responsibility of understanding its proper use. The Comptroller's Office provided information concerning the proper use of the GTC in September 2007 the Comptroller provided several training sessions as well as a hyperlink to the GTC Standard Operating Procedure. Your supervisor considers these charges unauthorized and I agree with him. The misuse of your GTC in this amount is considered grounds for removal, independent of the other charges in this Notice of Proposed Removal.

## Consideration of the Douglas Factors and Penalty

In determining appropriate action to propose in this matter, I considered relevant factors as set forth in Douglas v. Veterans Administration as described in the MCBA, Article 37, Section 6.

Your offenses, intoxication while on duty, absence without leave and using your Government Travel Card for unauthorized purposes, were intentional and related to your duties. You cannot perform your work effectively if you are intoxicated and absent. If you cannot be relied on to use the GTC as intended, alternatives must be found to finance your travel arrangements or others must be sent on travel assignments in your place. You are expected to follow standards for behavior and are expected to be at your desk during times of employment. *(Factor A)*

As a GS 819-12 Environmental Engineer Wastewater Treatment Specialist/NPDES Coordinator who reviews State NPDES permits, your supervisory controls are limited. You are expected to work independently in planning and carrying out your work. Your job requires timely, technically competent reviews of permits and other documents. Your behavior has caused me to lose confidence and trust in your judgment. *(Factor B)*

3

Trust is an essential ingredient in the relationship between a supervisor and staff member. Trust gives the supervisor reason to believe that an employee's judgment will be exercised soundly; that even if not supervised, the employee will do her best to follow established rules. When the trust no longer exists, the supervisor must exercise greater scrutiny of the employee's behavior than should be necessary, especially with an experienced employee such as you. *(Factor B and E)*

The trust that exists between employee and supervisor runs parallel to the trust that must exist between the public and the government. When an employee can no longer be trusted by his supervisor, the public trust is also breached. The public trust in the behavior of Government officials is secure only when supervisors can trust the people who report to them. *(Factor B and E)*

I have considered your past disciplinary record. On March 14, 2007, Mr. Swenson gave you a warning letter about disruptive behavior. At that time, he gave you a separate letter referring you to EAP. On March 28, 2007, Mr. Swenson gave you a memo clarifying expectations regarding time and attendance, use of government equipment, carrying out personal business while in duty status, and disruptive behavior. That memo specifically directed you to account for time away from your desk other than for brief breaks, to keep personal telephone calls to a minimum, and to cease loud and distracting telephone calls. On May 17, 2007, Mr. Swenson issued to you a Letter of Reprimand after continued problems with your attendance, behavior on the telephone, and numerous and extended personal telephone calls. On May 22, 2007, you returned to work from lunch under the influence of alcohol. You used abusive and offensive language and repeatedly behaved in an unacceptable manner. Your disorderly conduct continued until you were taken into custody by FPS agents. You were disciplined for this behavior with a one week suspension served in August 2007. *(Factor C)*

The proposed penalty of removal is consistent with the concept progressive discipline. Since March 14, 2007, as noted in the paragraph above, you have received a series of disciplinary actions which have not been effective in correcting your behavior. This action is in line with the penalties recommended for these offenses in the Conduct and Discipline Order, Guidance on Corrective Discipline. *(Factor G)*.

I considered your past work record. You have been with the Agency since May 21, 1984. Your work performance has been assessed as satisfactory. Your rapport with co-workers is uneven. People are uncomfortable when you are loud and disruptive. Unauthorized absences and using intoxicants while on duty indicate that you are not dependable. Your behavior has undermined my confidence in your ability to perform assigned duties satisfactorily. *(Factors D and E)*

I have considered the potential for rehabilitation. In spite of counseling and a succession of disciplinary actions, you have not maintained the level of conduct expected of all employees. You have been advised of the availability of the Employee Assistance Program. Even with offers of assistance, your behavior has not improved. In the past you have denied or minimized offenses. You continue to do so. I see no potential for rehabilitation. *(Factors J and K)*

4

Water Division management has used lesser informal and formal disciplinary actions. These alternative sanctions have not been adequate to change your behavior. *(Factor L)*

In light of these considerations, I believe removal is the appropriate disciplinary action at this time.

Employees of the Federal Service are to be of good character and maintain the high standards of conduct. They are to display qualities of good judgment, respect for their coworkers, and adherence to established rules and regulations. Your actions are not consistent with these standards and cannot be condoned. Your misconduct and exercises of poor judgment have conflicted with your ability to work effectively and efficiently within the Agency.

## Reply Procedures and Rights

You have fifteen (15) calendar days from receipt of this letter to reply to the proposed action. If necessary to prepare your response, you may request additional time. You have the right to reply to this proposal both personally and in writing and to submit affidavits, statements, or other documentary evidence in support of your reply.

You have the right to review the material management is relying upon to propose this action. You have the right to present a reply without representation or to be accompanied by a representative of your choice including an attorney or other representative including a Union representative. You may use a reasonable amount of duty time to research documents and prepare your reply.

Your written reply, request for an extension, and/or the name of your designated representative should be directed to Bharat Mathur, Acting Regional Administrator, through Mr. Martin Mills, Labor Relations Officer, Human Resources Branch, Mail Code: MP-10J. Mr. Mills will ensure that your written reply and/or your written designation of representative will be transmitted to Mr. Mathur.

If you and/or your representative wish to make a personal reply in lieu of a written reply or in addition to this notice, you or your representative should telephone Mr. Mills at (312) 353-0967 within seven (7) calendar days of your receipt of this letter, and he will schedule an appointment with Mr. Mathur for you. Mr. Mathur is the Deciding Official who will hear your reply.

Any reply you make, oral and/or written, as well as any affidavits, statements or other documentary evidence you present will receive careful consideration before a final decision is made on this proposed action. The final decision on this proposed action will be made by Mr. Mathur.

If you need procedural guidance concerning this action, or if you do not understand the reasons for this proposed action, or if you need regulatory interpretations, or access to the material relied on to support the reasons for this proposed action, or if you desire regulatory advice and

5

your breath smelled strongly of alcohol, and that you appeared to be intoxicated. He observed that the attendant would not release the car to you.

Mr. Swenson noted you were talking loudly, and repeating yourself frequently, in your conversation with the parking garage attendant. Two policemen arrived. Mr. Swenson asked the police what options they had in this situation as it appeared you were unable to drive safely. He said the police indicated that if you attempted to drive they would have arrested you immediately. Mr. Swenson further reported that the police said that if you did not attempt to drive, they could either let you go home in a cab or take you to medical facility.

Mr. Swenson offered to drive you home to Chesterton, Indiana. You accepted this offer and Mr. Swenson gave you a ride home. During the trip, he stated you were very talkative, repeating yourself frequently. He said your breath smelled of alcohol. He asked you if you had been drinking and you said, no, you'd just had a salad and a 'Long Island' at 10 o'clock with your friend Eva (Ava?).

On March 7, 2008, you spoke to Alan Nudelman, Senior Advisor, for the Water Division. He reported that you told him that you had been celebrating your birthday the previous day and asked him "Don't you get drunk on your birthday?"

These observations by Mr. Swenson, Ms Jackson, and Mr. Nudelman have led me to conclude that on March 6, 2008, you were on duty while under the influence of alcohol.

> **Charge 2:** You were Absent without leave (AWOL). (This is an offense described in the EPA Conduct and Discipline Order, # 3120.1, dated September 20, 1985. Nature of Offense #1: Attendance related offenses, b. Absence without leave (AWOL).)

**Specification:**

On Thursday, March 6, 2008, you reported for work as scheduled. Your tour of duty is from 8:00 AM to 5:30 PM. You left work at sometime before 3:30 PM. You did not notify your supervisor you were leaving, did not ask for leave and did not have leave approved before departing. Your supervisor, Mr. Swenson charged you 2 hours of absence without leave for the afternoon of March 6, 2008.

> **Charge 3:** You repeatedly used your Government Travel Card (GTC) for unauthorized purposes. (This is an offense described in the EPA Conduct and Discipline Order, # 3120.1, dated September 20, 1985. Nature of Offense #11: Using Government property or Government employees in duty status for other than official purposes.)

**Specification:**

Travel records for the period 11/01/2007, through 02/05/2008, indicate your Government Travel Card (GTC) was used for unauthorized purposes on 113 occasions totaling $6825.27 in charges.

2

The attached chart lists the unauthorized transactions include multiple cash withdrawals and charges when you were not in travel status.

Your supervisor, Peter Swenson, offered you an opportunity to explain the unauthorized transactions. You initially denied that you had used the GTC for purposes not related to official travel. Subsequently, you stated that prior to November, 2007, you had not been on official travel since 2002 and did not understand the rules for credit card use. You also said that a person from your bank told you it was alright for you to use the GTC for commuting to work and for meal charges during the work day and paying for medicine, as long as you repaid the charges. (You did admit to using the GTC for other purposes other than commuting to work and meals during the work day.) You said you were later told by another bank representative that you were not allowed to use the GTC for non-travel expenses under any circumstance, and you subsequently ceased using the card.

All employees sign a Memorandum of Understanding to receive the GTC that clearly states that it is to be used solely for expenses incurred for officially authorized government travel. Personal use of the card under any circumstance is specifically prohibited including ATM withdrawals without an approved travel authorization. Having been issued a GTC, you had the responsibility of understanding its proper use. The Comptroller's Office provided information concerning the proper use of the GTC in September 2007 the Comptroller provided several training sessions as well as a hyperlink to the GTC Standard Operating Procedure. Your supervisor considers these charges unauthorized and I agree with him. The misuse of your GTC in this amount is considered grounds for removal, independent of the other charges in this Notice of Proposed Removal.

### Consideration of the Douglas Factors and Penalty

In determining appropriate action to propose in this matter, I considered relevant factors as set forth in Douglas v. Veterans Administration as described in the MCBA, Article 37, Section 6.

Your offenses, intoxication while on duty, absence without leave and using your Government Travel Card for unauthorized purposes, were intentional and related to your duties. You cannot perform your work effectively if you are intoxicated and absent. If you cannot be relied on to use the GTC as intended, alternatives must be found to finance your travel arrangements or others must be sent on travel assignments in your place. You are expected to follow standards for behavior and are expected to be at your desk during times of employment. *(Factor A)*

As a GS 819-12 Environmental Engineer Wastewater Treatment Specialist/NPDES Coordinator who reviews State NPDES permits, your supervisory controls are limited. You are expected to work independently in planning and carrying out your work. Your job requires timely, technically competent reviews of permits and other documents. Your behavior has caused me to lose confidence and trust in your judgment. *(Factor B)*

3

Trust is an essential ingredient in the relationship between a supervisor and staff member. Trust gives the supervisor reason to believe that an employee's judgment will be exercised soundly; that even if not supervised, the employee will do her best to follow established rules. When the trust no longer exists, the supervisor must exercise greater scrutiny of the employee's behavior than should be necessary, especially with an experienced employee such as you. *(Factor B and E)*

The trust that exists between employee and supervisor runs parallel to the trust that must exist between the public and the government. When an employee can no longer be trusted by his supervisor, the public trust is also breached. The public trust in the behavior of Government officials is secure only when supervisors can trust the people who report to them. *(Factor B and E)*

I have considered your past disciplinary record. On March 14, 2007, Mr. Swenson gave you a warning letter about disruptive behavior. At that time, he gave you a separate letter referring you to EAP. On March 28, 2007, Mr. Swenson gave you a memo clarifying expectations regarding time and attendance, use of government equipment, carrying out personal business while in duty status, and disruptive behavior. That memo specifically directed you to account for time away from your desk other than for brief breaks, to keep personal telephone calls to a minimum, and to cease loud and distracting telephone calls. On May 17, 2007, Mr. Swenson issued to you a Letter of Reprimand after continued problems with your attendance, behavior on the telephone, and numerous and extended personal telephone calls. On May 22, 2007, you returned to work from lunch under the influence of alcohol. You used abusive and offensive language and repeatedly behaved in an unacceptable manner. Your disorderly conduct continued until you were taken into custody by FPS agents. You were disciplined for this behavior with a one week suspension served in August 2007. *(Factor C)*

The proposed penalty of removal is consistent with the concept progressive discipline. Since March 14, 2007, as noted in the paragraph above, you have received a series of disciplinary actions which have not been effective in correcting your behavior. This action is in line with the penalties recommended for these offenses in the Conduct and Discipline Order, Guidance on Corrective Discipline. *(Factor G)*.

I considered your past work record. You have been with the Agency since May 21, 1984. Your work performance has been assessed as satisfactory. Your rapport with co-workers is uneven. People are uncomfortable when you are loud and disruptive. Unauthorized absences and using intoxicants while on duty indicate that you are not dependable. Your behavior has undermined my confidence in your ability to perform assigned duties satisfactorily. *(Factors D and E)*

I have considered the potential for rehabilitation. In spite of counseling and a succession of disciplinary actions, you have not maintained the level of conduct expected of all employees. You have been advised of the availability of the Employee Assistance Program. Even with offers of assistance, your behavior has not improved. In the past you have denied or minimized offenses. You continue to do so. I see no potential for rehabilitation. *(Factors J and K)*

4

Water Division management has used lesser informal and formal disciplinary actions. These alternative sanctions have not been adequate to change your behavior. *(Factor L)*

In light of these considerations, I believe removal is the appropriate disciplinary action at this time.

Employees of the Federal Service are to be of good character and maintain the high standards of conduct. They are to display qualities of good judgment, respect for their coworkers, and adherence to established rules and regulations. Your actions are not consistent with these standards and cannot be condoned. Your misconduct and exercises of poor judgment have conflicted with your ability to work effectively and efficiently within the Agency.

## Reply Procedures and Rights

You have fifteen (15) calendar days from receipt of this letter to reply to the proposed action. If necessary to prepare your response, you may request additional time. You have the right to reply to this proposal both personally and in writing and to submit affidavits, statements, or other documentary evidence in support of your reply.

You have the right to review the material management is relying upon to propose this action. You have the right to present a reply without representation or to be accompanied by a representative of your choice including an attorney or other representative including a Union representative. You may use a reasonable amount of duty time to research documents and prepare your reply.

Your written reply, request for an extension, and/or the name of your designated representative should be directed to Bharat Mathur, Acting Regional Administrator, through Mr. Martin Mills, Labor Relations Officer, Human Resources Branch, Mail Code: MP-10J. Mr. Mills will ensure that your written reply and/or your written designation of representative will be transmitted to Mr. Mathur.

If you and/or your representative wish to make a personal reply in lieu of a written reply or in addition to this notice, you or your representative should telephone Mr. Mills at (312) 353-0967 within seven (7) calendar days of your receipt of this letter, and he will schedule an appointment with Mr. Mathur for you. Mr. Mathur is the Deciding Official who will hear your reply.

Any reply you make, oral and/or written, as well as any affidavits, statements or other documentary evidence you present will receive careful consideration before a final decision is made on this proposed action. The final decision on this proposed action will be made by Mr. Mathur.

If you need procedural guidance concerning this action, or if you do not understand the reasons for this proposed action, or if you need regulatory interpretations, or access to the material relied on to support the reasons for this proposed action, or if you desire regulatory advice and

assistance from a representative of the Human Resources Branch, you should contact Mr. Mills at (312) 353-0967.

You will remain in a duty status during the period of this proposed action. As soon as possible, after the time required for consideration of your reply, you will receive a written decision on this proposed action. If you choose not to reply to this proposed action, the decision will be made after a full review and careful consideration of the contents of the proposal memorandum and all supporting documentation, copies of which are included with your copy of this proposal.

A second copy of this proposal is provided for your designated representative.

**ACKNOWLEDGMENT OF RECEIPT**

I acknowledge receipt of this Notice of Proposed Removal.

_Mrs Hahn declines to sign._    Donald Anderson, Steward 5/2/08 Local 704

Signature                                         Date

_Mark Mills_                                    5/2/08

Witness                                          Date

List of Attachments:
1.  Statement from Peter Swenson
2.  Statement from Eloise Hahn
3.  Statement from Alan Nudelman
4.  Statement from Mery Jackson
5.  eMails from Peter Swenson, dated March 25 through March 27, 2008
6.  Audit Login report dated 3/27/2008
7.  eMail from Peter Swenson, dated 3/24/2008
8.  eMail Subject: Travel Card Audit Information Sessions, dated 9/12/2007 resent 9/18/2007 with the hyperlink material
9.  Memo dated Aug 6, 2007 – Formal Documentation of Misconduct, signed by Peter Swenson
10. Memo dated July 25, 2007 – Decision on Notice of Proposed 7 day suspension, signed by Bharat Mathur
11. Memo dated May 17, 2007 – Official Reprimand regarding Conduct Issues, signed by Peter Swenson
12. Memo dated March 14, 2007 – Written Reprimand and EAP referral from Peter Swenson, with responses signed by Eloise Hahn
13. EPA Order 3120.1, *"Conduct and Discipline Manual – Appendix – Guidance on Corrective Discipline."* 9/2085
14. List – Eloise Hahn Government Travel Card Charges 11/01/07 – 02/05/08

**Eloise Hahn/R5/USEPA/US**    To

07/18/2007 03:54 PM

        Subject  Performance Review Summary-Eloise Hahn

This mid-year 2007 I reviewed 8 permits, numerous MADI requests and assisted Ash Sajjad on the O&M rewards. As part of my review I organized his files, spent my own money in buying sups and ranked the mulnicipalities for discussion. I also wrote several Fact Sheets. As far as permit reviews go I was the most outstanding team member yet I only earned a fraction of what I should make for someone on my level. To be frank, I netted $19,639.10 for the past 6 months or $3,273month. I should be making $7,043 per month gross. Comparatively I earned $33,186 gross or $5,531 per month. This amount is 22.5% less. Alot of my
time I was sidetracted my numerous memorandums which I had to defend myself on, including a false arrest and suspension notice. These notices have
placed me under considerable mental, physical and monetary distress, particularly supporting 3 people on this meger salary.

Eloise Hahn/R5/USEPA/US          To

03/27/2008 08:45 AM

Subject   WHY DO YOU KEEP DOCKING MY PAY?

May I ask why I was AWOL last pay period.  The AWOL attributed to $582 overdraft charges in my checking accnt.  If I may state I leave my home at 5:30 am
and I don't return to 7:00 pm at night.  A 14 hr day.  Why do all the men get to work at home and not me?  I must say a 14 hour day is somewhat extreme
at 54 years old and almost 20 years ofd service here not to mention and additional 20 years of work at other employers.  Why do you wish to destroy
me?

*Incident*
3/27/08 —          *Lecture*
                    4/25/08

| Eloise Hahn/R5/USEPA/US | To | Peter Swenson/R5/USEPA/US@EPA |
|---|---|---|
| 03/27/2008 08:39 AM | cc | Robert Thayer/R5/USEPA/US@EPA |
| | bcc | |
| | Subject | Re: absences 🗎 |

On March 25 I removed my leave slip for the morning because I was here.  On March 26 I completed a leave slip for 3 hrds. absence in the morning.
Peter Swenson/R5/USEPA/US

| **Peter Swenson/R5/USEPA/US** | To | |
|---|---|---|
| 03/26/2008 05:30 PM | Subject | absences |

Ellie
Please provide to me, as soon as possible, a written explanation of your unexcused absences of March 25th and March 26th.
Peter

Eloise Hahn/R5/USEPA/US        To

03/27/2008 10:45 AM

Subject I PLAN TO FILE EEOC COMPLAINT TOMORROW IN
FEDERAL COURT HOUSE

PLEASE BE ADVISED THAT I WILL NEED TO SUBMIT TWO LEAVE SLIPS AND REVISE PEOPLE
PLUS NOW DUE TO PETER'S HARRRASSMENT
THAT I WAS AWAY FROM DESK ON BREAK. PLEASE BE ADVISED ASH AND QUINTIN NEED TO
BEGIN SUBMITTING LEAVE SLIPS FOR THEIR BREAKS.

I CANNOT TAKE THE ONGOING SEXUAL HARRASSMENT, UNEQUAL PAY, RETALIATION, ETC.
THE AGENCY NEEDS TO BE SUED. I CANNOT
GO ON BEING DISCRIMINATED. THAT IS IT.

THERE WILL BE A CHANGE IN PEOPLE PLUS JOYCE. PLEASE RECTIFY THE BOOKS

Eloise Hahn/R5/USEPA/US        To
03/27/2008 09:35 AM

Subject  Fw: WHY IS TSP NOT WITHHOLDING PAY FOR PENSION
         PAYMENTS

PLEASE BE ADVISED THAT YOUR OBSESSION TO DOCK MY PAY CONSISTENTLY HAS
RELENTLESSLY FORCED ME TO TAKE NUMEROUS FINANCIAL HARDSHIP WITHDRAWLS WHERE
I AM NO LONGER ABLE TO CONTRIBUTE TO MY PENSION LEAVING ME A MERE $30K FOR LIFE.
WOW.....WHAT A GREAT PLACE TO WORK...$30K FOR PENSION.....I GUESS I WILL BE ABLE TO
LIVE OFF THIS AMOUNT FOR 3 MONTHS WHATABOUT THE REMAINING 20 YEARS OF LIFE?
----- Forwarded by Eloise Hahn/R5/USEPA/US on 03/27/2008 09:33 AM -----



Daphne
Lawrence/R5/USEPA/US         To   Eloise Hahn/R5/USEPA/US@EPA
03/27/2008 09:13 AM          cc

                            Subject  Re: WHY IS TSP NOT WITHHOLDING PAY FOR PENSION
                                     PAYMENTS📧


Ellie,

I remember you talking to me about taking a "TSP Financial Hardship Withdrawal."  I do not remember the
exact date and I do not have access to your TSP Account. However, the TSP Hardship Withdrawal is not
a loan.   When you withdraw money from your TSP account you have a six month period in which you
can not contribute to the TSP and there is not match. The only money going into your TSP account
during the six month period  is the 1% Agency Contribution. You can contact  the TSP Service Office
directly  at the following number:

## 1-TSP-YOU-FRST (1-877-968-3778)


## What are the rules for a financial hardship withdrawal? ▲

While you are employed by the Federal Government, you may be able to withdraw your
own contributions and earnings for a financial hardship.  The amount of the financial
hardship withdrawal is limited to your financial need.  You cannot withdraw less than
$1,000.

To be eligible for a financial hardship withdrawal, your financial need must result from
at least one of the following four conditions:  negative monthly cash flow, medical
expenses (including household improvements needed for medical care), personal
casualty losses, or legal expenses for separation or divorce.

To help you determine whether you have a negative monthly cash flow and the amount
of the negative monthly cash flow, you can complete the worksheet that is provided
with the Financial Hardship Withdrawal Request (Form TSP-76).  To complete the
worksheet, you will have to use financial information for yourself and, if you are
married, your spouse.  You will have to determine your monthly income (i.e., from
employment, child support, and alimony) and expenses (i.e., housing, utilities,
dependent care, alimony and child support, and installment loan payments for loans

other than TSP loans). The worksheet also provides factors to determine an allowance for ordinary household expenses based on income and family size. The allowance takes into account items such as food, clothing, health insurance premiums, entertainment, and other miscellaneous expenses. (Credit card payments are included in this allowance so they cannot be used in determining expenses.) You do not have to return the worksheet with your request for a financial hardship withdrawal.

Although you will not have to provide either income information or documentation to substantiate the financial hardship, you should retain this information and documentation for future reference because you will have to certify on the Form TSP-76, under penalty of perjury, that you have a genuine financial hardship and what the reason for the financial hardship is.

After making a financial hardship withdrawal, you cannot contribute to your TSP account for 6 months. If you are a FERS participant, you will not receive any Agency Matching Contributions for the period which you are not making employee contributions; however, you will continue to receive Agency Automatic (1%) Contributions. At the end of the 6-month period, your contributions will not resume automatically. You must make a contribution election on Form TSP-1 (or your agency's electronic version) and file it with your agency if you want to resume contributions. Your contributions will then be allocated according to your most recent contribution allocation. You are eligible to request another financial hardship withdrawal 6 months after your previous one.

Daphne B. Lawrence
Human Resources Specialist (Labor Relations)
(312) 886-7528
Eloise Hahn/R5/USEPA/US

> Eloise Hahn/R5/USEPA/US
> 03/27/2008 08:52 AM
>
> To    Daphne Lawrence/R5/USEPA/US@EPA
> cc
>
> Subject   WHY IS TSP NOT WITHHOLDING PAY FOR PENSION PAYMENTS

Daphne:

Please get back with me on subject question. Thanks.

was union was unable to get the removal proposal retracted. He was not sure whether the union would represent the aggrieved in a formal hearing.

EEO counselor interviewed Peter Swenson. Counselor presented the allegations of discrimination as stated by the aggrieved. Mr. Swenson stated the aggrieved has had a long history of inappropriate behavior and had been docked for time and attendance issues. He indicated that the proposed penalty of removal is consistent with the concept of progressive discipline and the Douglas Factors.

Aggrieve's Notice of Proposed Removal provides the rights of the aggrieved to present a reply with or without representation regarding this notice. Aggrieved is scheduled to meet with Bharat Mathur, Acting Regional Administrator on June 4, 2008.

Mr. Swenson was unable to provide a resolution for this complaint. Management's Final agency decision with come from Bharat Mathur, Acting Regional Administrator. Aggrieved was given Final Interview Notice.

**Documents Reviewed:**

a. Emails dated: 03/27/2008 from Eloise Hahn to Peter Swenson.
b. Email dated: 07/18/2007 from Eloise Hahn to Peter Swenson.
c. Memorandum dated 05/02/2008 Notice of Proposed Removal.
d. Notice of Filing in the United States District Court For The Northern District of Illinois Eastern Division, dated May 15, 2008.
e. Civil Action No. 08CV2333 Northern District of Illinois Eastern Division

_____
Signature of EEO Counselor          :

_____
Date

_____
Telephone Number of EEO Counselor

**EXHIBIT B**

# *AFGE - Local* 704
# American Federation of Government Employees AFL-CIO
# P. O. Box 0799
# Chicago, Illinois, 60690-0799
# (312) 886-3575

<u>**MEMORANDUM**</u>

DATE:    June 4, 2008

SUBJECT: Response to Notice of Proposed Removal

FROM:  Jeffrey Bratko, Chief Steward and Vice President for Professional Unit Labor Relations, AFGE Local 704

Eloise Hahn, Environmental Engineer
NPDES, Water Division

TO: Bharat Mathur, Deputy Regional Administrator
U.S.EPA Region 5

This memo is a partial response to the May 2, 2008, Notice of Proposed Removal (NOPR) issued to Eloise Hahn, Environmental Engineer, NPDES, Water Division.  Ms. Hahn will also be presenting an oral response during an in-person meeting with you in June of 2008.

We ask that the deciding official keep in mind the Agency's stated policy:

**"It is EPA Policy that primary emphasis be placed on preventing situations requiring disciplinary actions through effective employee-management relations and that when work performance and/or conduct are not maintained at an acceptable levels, constructive corrective action will be taken by responsible supervisors on a timely basis."**

We are confident that if you, the deciding official, evaluates the NOPR and the way that this matter has been handled against that policy, you will agree with us that not only did the Agency fail to place proper emphasis on preventing the situation but they also failed to employ either effective employee-management relations or constructive actions.

## I. General Response

Ms. Hahn apologizes for her inadvertent misuse of the travel card.  Ms. Hahn also regrets

that the events of March 6, 2008, took place but her recollection of the events and her explanation as to what happened on that day are much different than what Ms. Hyde presented in the NOPR. Ms. Hahn deeply regrets that this entire situation has occurred. Ms. Hahn has made efforts to improve her attendance over the past year and hopes that she will be allowed to continue her efforts to improve. Ms. Hahn also is committed to responding cooperatively to any suggestions regarding how she can improve as an employee and will endeavor to correct any behavior that her supervisors find objectionable. Ms. Hahn would have explained all of this to Ms. Hyde had Ms. Hyde given Ms. Hahn any opportunity to discuss these matters with Ms. Hyde.

It should be kept in mind that Ms. Hahn did no harm to the Agency, public or the regulated community through the actions described in the NOPR. It is also troubling to both the Union and Ms. Hahn that the authors of the NOPR appear to have gone out of their way to use misleading language which, no doubt, created an unfairly negative view of Ms. Hahn in the eyes of Ms. Hyde. For example, in Mr. Swenson's write-up of the incidents of March 6, 2008, he includes information about a cab driver being reluctant to accept her credit card because of concerns about its validity and claiming that the garage staff noted that Ms. Hahn had problems earlier paying for her parking. Such statements have absolutely no bearing as to the charges against her, are hearsay, and are anecdotal at best. However, such statements create the unfair impression for the proposing official that Ms. Hahn was trying to do something wrong such as using an invalid credit card.

The Union has observed in the past that the Agency team that authors such NOPRS, presumably primarily an agency attorney who should display a better sense of judgment and ethics, frequently use phrases and language to create a misleading impression rather than making an effort to properly characterize the facts. Because of the Agency's past pattern of grossly exaggerating the conduct of employee's like Ms. Hahn, an employee's past history often sounds much worse than it was in reality. Because, in the past, the Agency has gone out of its way to portray Ms. Hahn's actions and behavior in an unfair and inaccurate manner, the deciding official may be misled into thinking that Ms. Hahn's past conduct is far worse than an honest account would reveal. We hope to correct the false impression of Ms. Hahn that has been created in the NOPR. Ms. Hahn sincerely wants to improve but she does not want her faults exaggerated to the point that she is made to appear to be a hopeless case.

We also ask the Agency to keep in mind that it would not take an environmental enforcement action against a regulated company based on strength of evidence equivalent to that it presented in the NOPR. The Agency is proposing to do the equivalent of putting Ms. Hahn out of business by ending her job. No matter how severe the environmental violations may be at a facility, EPA almost never proposes that a facility or company be permanently shut down and put out of business. Firing Ms. Hahn is the equivalent of shutting down a business and EPA would only consider such a measure if the actions of the company represented an imminent and substantial endangerment. In the case of Ms. Hahn, her inadvertent misuse of the travel card, alleged AWOL offense, and even the untrue claim that she was under the influence of alcohol do not rise to the level of imminent and substantial endangerment.

2

Why should Ms. Hahn be treated far more harshly than EPA has ever treated the most serious polluter?

## II.   The proposing official failed to follow Agency procedures for disciplinary matters

The failure of the Agency to follow the Agency disciplinary process procedures should be considered by the deciding official because those failures led to a proposed firing that is not the correct action to take in this situation.

Ms. Tinka Hyde is the proposing official in this matter.  Ms. Hyde is an acting Director of the Water Division and it is possible that she has had little previous experience in implementing an investigation of alleged employee misconduct. It is also possible that Ms. Hyde has no previous experience dealing with a disciplinary situation that involved an NOPR. However, despite her apparent inexperience or lack of familiarity with Agency policy and procedure in this area, Ms. Hyde was required to follow Agency guidance and policy regarding the disciplinary process. Ms. Hyde failed to fulfill her obligations.  Ms. Hyde made no effort to obtain unbiased or balanced information about Ms. Hahn.  Ms. Hyde never gave Ms. Hahn an opportunity to explain her situation to her directly.  Ms. Hyde never gave AFGE Local 704 any opportunity to provide its views on this matter.  A fair minded manager who was interested in making a decision based on all of the relevant facts and information would have sought out all relevant facts and viewpoints about this matter before making a decision to propose that a long time employee be fired from the Federal service.   It is appalling that the proposing official passed this proposed death sentence for Ms. Hahn's job down upon Ms. Hahn without so much as asking Ms. Hahn a single direct question to be used in the decision making process.

It should be noted that Ms. Hyde never discussed the subject of the NOPR with Ms. Hahn prior to issuing the NOPR.  Issuing such a NOPR, without ever discussing the matter with the employee she is proposing should be fired, is a terrible management practice and violates Agency guidance on the disciplinary process.  U.S.EPA's disciplinary process procedures require that the proposing official meet with the employee to hear the employee's side of the story before deciding to issue a proposed disciplinary action.  Ms. Hyde displayed no interest in hearing Ms. Hahn's side of the story.  However, it appears Ms. Hyde listened to the voices of the secret tribunal that recommended the termination of Ms. Hahn.  The secret tribunal tried Ms. Hahn in absentia without any notice or opportunity for Ms. Hahn to provide them with the information they are required to consider by Agency policy and the MCBA.  It was completely inappropriate for Ms. Hyde to rely solely on the one-sided recommendation of the secret tribunal without so much as allowing Ms. Hahn the dignity of an opportunity to respond to the tribunal's assessment of Ms. Hahn and the alleged facts they claim support their recommendation.

The EPA "Disciplinary Process Handbook, April 1998" (DPH) describes how Agency managers are to conduct the disciplinary process at EPA.  The DPH contains a list of Do's and Don'ts for the proposing official (Ms. Hyde in this instance).  Among the dos

that Ms. Hyde did not do are the following:

- Ms. Hyde did not meet with the employee.
- Ms. Hyde did not consider all relevant information
- Ms. Hyde did not consider EAP intervention

No employee should be subjected to discipline without a chance to tell their side of the story. As noted previously, Ms. Hyde did not even meet with Ms. Hahn to let her present information that Ms. Hyde should have considered when constructing her Douglas Factors analysis.

It is evident from the NOPR and the fact that Ms. Hyde did not meet with Ms. Hahn that she did not consider all relevant information. She did not consider, for example, the fact that prior to using the travel card for personal use, Ms. Hahn called the card issuer and was told that she could use it for food and other purchases that the Agency characterizes as personal use. Ms. Hyde and the secret tribunal never called the card issuer to verify whether or not Ms. Hahn's assertion was correct. However, the Union has done that and confirmed that the card issuer is providing misleading information that would lead an employee to believe that the travel card can now be used for personal expenses. Ms. Hyde and the secret tribunal did not take that step because to do so would undermine their goal of firing Ms. Hahn.

Had Ms. Hyde spoken to Ms. Hahn and asked Ms. Hahn about the events of March 6, 2008, she would have learned two very crucial facts:

1. Ms. Hahn uses mouthwash or mouth rinse frequently and the smell of the mouthwash or mouth rinse could easily be mistaken for the smell of some kind of liquor. In addition, when using such mouthwash or mouth rinse, it is possible Ms. Hahn spilled a small amount on her clothing thereby causing a fellow employee to mistake the smell for liquor of some kind. Please note that mouthwashes such as Listerine contain approximately 27% alcohol. There are some mouthwashes that do not contain alcohol but the smell of such mouthwashes can be mistaken for the smell of a alcoholic beverage.
2. On March 6, 2008, Ms. Hahn accidentally took a double dose of the prescription medication that she uses to control the sugar level in her blood. The medication, metformin, can cause a number of side effects when a patient takes too much. The side effects can include confusion and changes in behavior.

It is similarly evident that the Agency did not even consider EAP intervention like they have with other employees. Instead of considering that option before Ms Hahn's conduct reached a level where it would result in a NOPR, the Agency merely notes that, at some unidentified time in the past, the Agency advised Ms. Hahn of the availability of the EAP. Keep in mind that since at least November of 2007 the Agency has had access to records of ongoing personal misuse of the travel card yet they never sought or offered EAP intervention during that time period so that this entire matter could be resolved when the amount of misuse was at a low level. Of course, the proposing official does

4

not note those facts in the NOPR because such facts tend to undermine the proposal to fire Ms. Hahn and raise serious concerns regarding the possibility management was engaged in entrapment of Ms. Hahn through intent or neglect of duties on the part of the proposing official and the other members of the secret tribunal.

Similarly, despite claiming that Ms. Hahn was on duty while under the influence of alcohol on March 6, 2006, there is no evidence management made any effort to direct Ms. Hahn to the EAP at that time or since that date. Apparently the Agency either felt Ms. Hahn did not have any problem or it felt she had a problem but did not want it addressed because that might interfere with the plan to fire Ms. Hahn.

The DPH lists the steps that are supposed to occur in EPA's disciplinary process. Step 3 requires that the proposing official considers the facts of the situation. It requires that the proposing official "meet with the employee to get his/her side of the story". The DPH points out that the meeting with the employee is part of gathering the facts and is different from the formal response to the proposed action that the employee presents to the deciding official. As noted above, Ms. Hyde left out this crucial step in the process and thereby demonstrated an unacceptable bias against Ms. Hahn. Ms. Hyde was apparently willing to believe every unfavorable assessment made about Ms. Hahn by the secret tribunal but she was not willing to give Ms. Hahn any opportunity to tell her side of the story and to present factors that she believes should mitigate the proposed firing to something less severe.

### III. The allegations of misconduct are unacceptably vague which denied Ms. Hahn a fair opportunity to respond to the Agency's Notice of Proposed Removal

**The Agency failed to clearly identify the offenses it alleges were committed by Ms. Hahn**

**Charge 1 is vague because the description of events do not support the charge listed**

In order for an employee to be given a fair opportunity to respond to a NOPR, the Agency has to be very clear in terms of what offense it claims the employee committed. It is not enough for the Agency to merely describe the conduct. Because the Agency has an established Order on Conduct and Discipline and specific numbered offenses, the Agency has an obligation to clearly and unequivocally identify the specific offense it claims an employee committed.

The NOPR states that Ms. Hahn was on duty while under the influence of alcohol. However, the evidence and information it cites in support of that allegation do not support the charge that was listed. The proposing official first alleges that the employee was away from her work station at about 11:30 AM. The proposing official goes on to allege that the employee returned to work at about 12:35 PM. That statement, which we dispute as to its accuracy and implication, does not in any way show proof of evidence of being under the influence of alcohol. All that statement reveals is that on two occasions on March 6, 2008, Ms. Hahn's supervisor noted that she was not at her desk. That is not proof of being under the influence of alcohol.

The next piece of information that is provided in the NOPR related to the charge that Ms. Hahn was under the influence of alcohol is that at an unidentified time Ms. Hahn spoke with a co-worker Merry Jackson who said she could smell liquor on Ms. Hahn's breath but that, perhaps, the liquor smell was from last night. That statement in no way proves that Ms. Hahn was under the influence of alcohol. Smelling of alcohol is in no way proof of being "under the influence of alcohol". In addition, as noted previously, Ms. Hahn uses mouthwash and mouth rinses which can contain alcohol or smell like an alcohol based beverage such as a liquor.

The next piece of information that EPA cites to support its claim that Ms. Hahn was under the influence of alcohol while on duty is a one-sided and inaccurate description of incidents that occurred sometime after 3:30 PM on March 6 in the parking garage at 318 S. Federal. However, on the second page of the NOPR the Agency notes that Mr. Swenson charged Ms. Hahn with absence without leave (AWOL) for 2 hours (3:30 to 5:30 PM) on March 6, 2008. Since Ms. Hahn was on absence without leave status for that time period she could not have been "on duty while under the influence of alcohol". Whatever happened in the parking garage that the proposing official thinks is proof of being under the influence of alcohol is irrelevant because Ms. Hahn was not on duty at that point in time.

Because the description, or "Specification" provided in the NOPR does not support the charge listed, Ms. Hahn is being denied an opportunity to respond to the alleged charge. Is Ms. Hahn being charged with taking a long lunch on March 6? Is Ms. Hahn being charged with smelling like liquor which the witness admits could have been from the night before? Is Ms. Hahn being charged concerning her behavior at a time when she was no longer on duty? Ms. Hahn cannot possibly have a fair chance to respond to the charge when the evidence or "Specification" provided does not, in any way, deal with being on duty while under the influence of alcohol.

**Charge 2 is vague because the description of events do not support the charge listed**

Charge 2 seems to claim that Ms. Hahn was AWOL on March 6, 2008. The proposing official makes the bare assertion that Ms. Hahn left work sometime before 3:30, did not notify her supervisor that she was leaving, and did not ask for leave and did not have leave approved before departing. No proof is offered for this bare assertion. However, to the extent the Agency discusses the events that occurred after 3:30 PM on March 6, 2008, in its "Specification" under Charge 1, the description of events does not support the charge that was listed.

According to the Agency's own account of what happened after 3:30 PM on March 6, 2008, at no time did Ms. Hahn indicate that she was planning on leaving for the day. At no time did Ms. Hahn refuse to return to work. At no time did she attempt to drive her car. At no time did she refuse to follow the directions of her supervisor. Ms. Hahn, in fact, very closely listened to her supervisor during that time period and followed his instructions. Ms. Hahn was with her supervisor until approximately 5:30. During the

time she spent with her supervisor she discussed a number of matters including work related matters. Those facts simply do not support the specified charge.

Is Ms. Hahn being charged with following the direction of her supervisor between 3:30 and 5:30 on March 6, 2008?

**Charge 3 is vague because the description of events do not support the charge listed**

The NOPR states that Ms. Hahn's repeated use of the travel card for unauthorized purposes is offense 11, using government property …for other than official purposes." The proposing official and her secret tribunal willfully and intentionally omitted the full text of offense #11. That intentional omission could lead the deciding official to misunderstand the true nature of offense #11 and whether it has any relevance to Ms. Hahn's' conduct. The full text of offense #11 is the following:

**"Using Government property or Government employees in duty status for other than official purposes. Penalty depends on the value of the property or amount of employees time involved, the nature of the position held by the offending employee, and other factors."**

The travel card is not government property. The line of available credit on the travel card is not government property and was not authorized by Congress so it does not represent property owned by the government. The Agreement signed by Ms. Hahn when she applied for the travel card does not state that it is government property. Even if one was to assume that the card was government property Ms. Hahn's personal use of the card would constitute diminimus use of government property which is allowed by EPA. The EPA MOU that the Agency claims all employees sign does not state that the card is government property. The Union is not disputing that the MOU and Agency policy contain restrictions on the use of the travel card. However, not all violations of Agency policies or MOUs are, or should be considered, offenses under the Order on Conduct and Discipline. The Agency has the burden of showing that Ms. Hahn's offense is punishable under a specific category of offenses that the Agency has established under the Order on Conduct and Discipline.

If the Agency wanted to punish misuse of the travel card under the Agency Order on Conduct and Discipline it could have revised its Order to incorporate such alleged misconduct into a specific offense category or it should have created a new offense category to cover this kind of offense. However, there is no evidence that the Agency ever anticipated using offense #11 for misuse of a travel card or has ever placed employees on notice that misuse of a travel card would be considered to be offense #11.

The Union does not believe that the type of travel card misuse Ms. Hahn is alleged to have committed should result in formal disciplinary action under the Order on Conduct and Discipline. It is clear from the description of offenses listed that the offenses listed in the table of penalties were meant to apply to offenses that have far more impact and significance than misuse of a travel card which is not Agency property and costs the

Agency nothing and causes no real harm to anyone. However, for the sake of argument, and applying the Agency's reasoning, the alleged offense would be more comparable to offense #22 "Negligent performance of duties – where damage or waste to government property is insubstantial." Culpable negligence in the performance of official duties is a failure to exercise the degree of care required under the particular circumstances, which a person of ordinary prudence in the same situation and with equal experience would not omit. *Mendez v. Department of the Treasury*, 88 M.S.P.R. 596, ? 26 (2001); *see also Williams v. Department of Veterans Affairs*, 65 M.S.P.R. 612, 612-14 (1994). Viewing misuse of the travel card as a type of negligence makes more sense than trying to make a tortured interpretation of the concept of government property.

To the extent Ms. Hahn misused her card based on bad or incorrect advice provided by the card issuer, even under the overly harsh views typically adopted by EPA, her offense would merit no more than the lowest of penalties under offense #22, and only if one completely ignores all other factors that would mitigate even that penalty.

According to Article 42 - Discipline, of the Master Collective Bargaining Agreement (MCBA), all disciplinary actions will be taken only for just and sufficient cause. (Article 42, Section 3) The Union and Ms. Hahn believe there is not just and sufficient cause to fire Ms. Hahn. We request you consider the information provided in this response when making a decision regarding the proposed firing of Ms. Hahn.

## IV. Ms. Hahn's account of the events of March 6, 2008 and her inadvertent misuse of the travel card

### March 6, 2008

On March 6, 2008, Ms. Hahn was having a stressful day for reasons related to work. In addition, Ms. Hahn had just turned another year older which is a stressful situation for many professional women in their mid - fifties. Mr. Swenson, as usual, was closely monitoring her activities such as monitoring her work location during the lunch hour.

Adding to Ms. Hahn's stress were her concerns about her work. Two days earlier, on March 4, 2008, Ms. Hahn contacted her supervisor indicating that she wanted to talk to him about her assignments and workload. Ms. Hahn felt that some work assigned to her needed to be reassigned. Mr. Swenson could not find time to speak to Ms. Hahn about this important issue until March 6. On March 6, after a brief discussion, Mr. Swenson did agree to reassign one permit but he did not agree to reassign any other work. He apparently implied or directly suggested that she do a better job of prioritizing her work. Perhaps Mr. Swenson was less that sympathetic and less than reasonable about Ms. Hahn's workload because he was facing his own excessive workload that would keep him staying in the office late despite the need to leave early for a very important trip to see his daughter. Mr. Swenson's handling of Ms. Hahn's concern about her workload left Ms. Hahn more stressed about her work.

No doubt Mr. Swenson was also experiencing stress on March 6, 2008. He was, as he

notes in his transcription of his notes of the events of March 6, "…. scheduled to be on leave beginning at 2:30 pm (traveling to Rochester NY via car to pick up my daughter from college)." After a long day of work, Mr. Swenson was going to face the arduous task of driving in Chicago and northern Indiana traffic, in the winter, to Rochester NY, a site well known for its snowy winters. Perhaps he felt strong resentment that day when he presumed Ms. Hahn was on the phone "apparently with a travel agent making vacation plans." While he was faced with an arduous winter drive across several states to serve as a taxi for his daughter, Ms. Hahn (in his mind) was planning a pleasant vacation. Perhaps that resentment led to anger and he reacted by sending Ms. Hahn a nasty message a short time later at 2:04 PM. Adding to his stress was that he had unfinished business which delayed his departure until approximately 3:25 pm. Despite being over an hour past his departure time and facing an ever more arduous driving trip to Rochester NY, Mr. Swenson, quite extraordinarily, found time to stop by Ms. Hahn's desk before he left, for no apparent reason other than to "see if she was working.". One has to wonder how much anger filled Mr. Swenson's mind when he noted that she was not there and "it appeared that she had left.". Given his state of mind one has to read his account of the events of March 6 with a significant amount of skepticism in terms of whether or not they are a factual account of the events uncolored by bias, anger, or other factors.

Ms. Hahn's workstation is not on the path to the door for Mr. Swenson and he would not pass by her office by chance. Mr. Swenson does not monitor other employees as closely as Ms. Hahn. Earlier in the day, knowing she was already under stress due to her concerns about her workload, Mr. Swenson embarked on a series of actions that were either intentionally or unintentionally designed to push Ms. Hahn over the edge. Apparently Mr. Swenson monitored Ms. Hahn's workstation at 11:30 AM, at 12 noon and after 12 noon until at least 12:35. He then monitored her again between 12:45 and 1 PM. At 2 PM Mr. Swenson added to Ms. Hahn's stressful day by sending her a message concerning his belief that her conduct was unacceptable. Prior to sending that message he did not offer her an opportunity to explain her conduct. Instead, he assumed Ms. Hahn had done something wrong demonstrating a clear bias against Ms. Hahn. Ms. Hahn could have been in the bathroom, in a conference room making a call, meeting with someone in a conference room or doing any one of a number of other work related tasks. However, it appears Mr. Swenson assumed the worst about what Ms. Hahn was doing when he did not find her at her desk.

Perhaps Mr. Swenson's own stressful situation led him to misdirect his energy and anger at Ms. Hahn on that particular day. It is not unheard of for a man, experiencing stress, to strike out at the closest vulnerable woman and Mr. Swenson was all too aware of Ms. Hahn's extreme vulnerability and inability to defend herself well.

Given that Ms. Hahn felt she had too much work, given her supervisor's almost non stop monitoring of her every move, given that she was experiencing a somewhat depressing birthday and given Mr. Swenson's 2:04 PM message implying that Ms. Hahn was engaged in misconduct before giving her an opportunity to tell her side of the story, Ms. Hahn began to feel the physical effects of such stress. Adding to her physical stress was the fact she had accidentally taken a double dose of the medication used to control her

diabetes. The instruction label had been changed on her prescription and the new wording, along with the stress she had been experiencing, probably caused her to take a double dose of the medication by accident. The double dose of medication further lowered her blood sugar level and made the situation even worse.

Mr. Swenson was well aware that Ms. Hahn was a borderline diabetic and on a variety of medication to deal with other medical conditions, including psychological conditions. He had become aware of that fact by at least the early summer of 2007 and possibly earlier. Presumably, as a concerned supervisor, he educated himself about the working conditions, such as stress, that would cause a borderline diabetic to move to a dangerously low sugar level. Presumably he also educated himself about the potentially life threatening, or conduct altering, side effects of the other medication she was taking. Presumably he was aware that the effects of the medication she was taking, and the effects of a low blood sugar level, could lead her to behave abnormally or to appear to be intoxicated. If he did not educate himself about her medical condition and the side effects of her medication he would be putting himself and Ms. Hahn in a dangerous position. He would be unable to recognize a dangerous decline in her health putting her at risk. Would he want to be unprepared to respond to a medical crisis that could lead to the death or serious injury of Ms. Hahn?

Either Mr. Swenson was aware that stress for Ms. Hahn could push her into a medical crisis related to diabetes or he chose not to know what factors, related to work, would make her medical condition worse. If Mr. Swenson had even a minimal amount of knowledge about diabetes, he would have been aware that the stress that Ms. Hahn was under on March 6, 2008, could cause a dangerous drop in her sugar level.

Ms. Hahn's health was pushed over the edge by Mr. Swenson's 2:04 PM e-mail which she felt made unfair and incorrect negative conclusions about her conduct. Ms. Hahn realized that her sugar level was dropping and she should test her blood sugar level and determine if she needed to take insulin.

Ms. Hahn realized that her test kit was in her vehicle parked in the parking garage at 318 S. Federal. Taking a brief break from work (like so many other EPA employees do when they run out for a coffee from Starbucks or for a cigarette or other break time activity), Ms. Hahn, walked over to the parking garage where she encountered Mr. Swenson. Mr. Swenson, no doubt already angry about the long drive he was facing and the fact that his late afternoon last attempt to check on Ms. Hahn had failed to find her at her desk, reacted as one would expect. He assumed the worst about Ms. Hahn and her reason for being at the parking garage.

Mr. Swenson informed two employees of the parking garage that Ms. Hahn was in no condition to drive a car. Apparently, they had not concluded that fact until pushed to that conclusion by Mr. Swenson. Perhaps they felt bullied into such an assumption by an obviously angry Mr. Swenson. Rather than ask Ms. Hahn about her state of health or mind and whether or not she needed medical condition, which one would expect he would do knowing her medical conditions and given his claim that she was in no

condition to drive, Mr. Swenson called Al Nudelman.   Mr. Nudelman is not a trained medical professional.   What Mr. Nedelman is trained to do is to help managers who want to document a case against an employee.

It is not surprising that Mr. Nudelman thought it best that the police department be contacted.  Mr. Nudelman was well aware of the serious problems that occurred for Ms. Hahn the previous year when the Agency turned to the police authorities to deal with Ms. Hahn.

Ms. Hahn, well aware of the hard ball tactics used by the agency, and police authorities, against her in the past was clearly nervous and concerned.   Mr. Swenson claims she jumped randomly from topic to topic and spoke loudly and repeated herself frequently.  However, that behavior is normal for Ms. Hahn and is in no way evidence of being under the influence of alcohol.

Mr. Swenson also claims he asked Ms. Hahn why she was not at work and he claims she answered that she was trying to get her car to go home.  However, he goes on to say that apparently she had either lost her ticket or could not get her credit card to work.  However, the fact is that she did not have her ticket because it was back at her desk because she had not planned to leave work for the day so she did not need her ticket.  Merely going to the parking garage to retrieve her medical test kit did not require her parking ticket.

In his account of what happened, Mr. Swenson states that during the time period he was driving Ms. Hahn home he asked whether she had been drinking and her reply was that she said she had not been drinking, that she just had a salad and a "long Island" at about 10 o'clock with her friend Ava.   Given that Mr. Swenson also reported that he met with Ellie about 10:30 am it is evident that, even if Ms. Hahn had made the alleged statement, it would have been a reference to 10 pm the night before.   There is no way that a drink at 10 pm on March 5 would render Ms. Hahn "under the influence of alcohol" until 4 pm the following day, March 6.

Given Ms. Hahn's alleged statement that she had not been drinking, one would think, if his account of her conduct is accurate, that Mr. Swenson would have been concerned that some health problem was the source of the conduct he described.   However, Mr. Swenson's written account of events reveals that he never expressed any concern about her health.  His primary concern appears to have been to try to solicit an admission that Ms. Hahn was under the influence of alcohol and to color his description of her behavior in a way to give the reader the impression that she was under the influence of alcohol.

During this time on March 6, 2008, Ms. Hahn is experiencing a very difficult situation.  She is already under mental and physical stress due to Mr. Swenson's constant monitoring of her activities and due to her concern that her sugar level had dropped and required insulin.   She may have been experiencing mental confusion and physical problems due to a low sugar level.   That could easily account for the problem Mr. Swenson described when she arrived home and had trouble opening the door.

Furthermore, Ms. Hahn had reason to be concerned that any perceived resistance on her part to the actions of her male supervisor would result in a repeat suspension for unjust reasons as had happened to her the previous year. Ms. Hahn had never planned to leave work early on March 6 and certainly did not plan on going to her home in Chesterton. In fact, Ms. Hahn had planned to go to her home in Berwyn where her family was going to gather to celebrate her birthday. However, given her boss's obvious efforts throughout the day to document some kind of misconduct on the part of Ms. Hahn and the other hostility he demonstrated when she sought relief from her workload, she felt she was being compelled and bullied into getting into his vehicle and being driven by him to Chesterton. The implied threat that existed was that if she did not follow her boss's direction she could end up arrested or worse. Ms. Hahn cooperated under duress and fear that if she did not cooperate she could be facing another unfair disciplinary action.

Mr. Swenson's own description of Ms. Hahn's behavior on March 6, 2008, includes the following statements:

-- She talked loudly, repeating herself frequently, but was not belligerent
-- She told Toni (at the parking garage) that I was a wonderful boss
-- She was able to direct me to her address without much difficulty

None of that behavior is consistent with an employee under the influence of alcohol. However, it is consistent with an employee who is fearful of what her boss will do to her so she nervously repeats herself, talks to loudly, and compliments her boss.

To the extent that the Agency or some Agency employee's felt that Ms. Hahn appeared drunk, that appearance could easily be described as a side effect of the prescription for valium that she was taking at the time of these incidents on March 6, 2008.

**Credit card misuse**

Ms. Hahn is not a frequent traveler for EPA. In fact, she rarely is assigned work that requires official travel. As an infrequent traveler she is not familiar with all the policies and guidelines that are applicable to official travel. Some of those policies, no doubt, were pointed out to her in the distant past when she first received her travel card, however if one is not a frequent traveler it is hard to retain full knowledge about policies that one rarely needs to follow.

Last fall, Ms. Hahn called the travel card issuer and asked about use of the card. She was informed that she could charge meals and other expenses. No real distinction was made between official travel and personal use of the card. Based on what she was hearing, Ms. Hahn was under the impression that she could use the card for expenses that the Agency believes are personal expenses.

Neither Ms. Hyde or Mr. Swenson, or any other EPA management official, appears to have bothered to determine whether, in fact, the travel card issuer did give Ms. Hahn information that misled her about the permitted use of the card. However, very recently

Union steward, Uylaine Barringer called the card issuer and was told that the card issuer would not mail the credit card bill to Ms. Barringer's work address because Ms. Barringer may have personal expenditures on the card (that she would not want seen by others at work). Such a statement would surely lead an infrequent traveler to assume that we are allowed to use the travel card for personal use.

A summary of Ms. Barringer's phone conversation with a representative of the card issuer is attached to this memo as attachment 1.

Had the Agency promptly notified Ms. Hahn that her personal use of the travel card was not allowed despite what Ms. Hahn had been told by a representative of the card issuer, she would have promptly ceased all use of the card except for official travel.

Given Ms. Hahn's rare need to travel for EPA, one wonders why she was forced to accept a travel card in the first place.

## IV. Response to misleading or incorrect statements made in the NOPR and the Douglas Factors Analysis

The Agency is required to do an analysis for each of the Douglas Factors. The deciding official is required to consider the Douglas Factors when determining what action to take. The deciding official has an obligation to do more than just rubber stamp the Douglas Factors analysis prepared by the proposing official. If the role of the deciding official was merely to accept, without question, the analysis and recommendations of the proposing official there would be no need for a deciding official. The role of the deciding official is to make an independent decision based on all of the facts and information. Because it is clear that the secret tribunal did not prepare a balanced, fair or complete Douglas Factors analysis, the Union offers a more credible analysis in this response.

In the NOPR, Ms. Hyde claims she considered the factors set forth in Douglas v. Veterans Administration and the MCBA, Article 37, Section 6. We do not believe that the proposing official prepared a complete, or completely accurate, Douglas factors analysis. Rather than defer to the incomplete Douglas Factors analysis offered by the proposing official and the members of the secret tribunal, the Union offers the analysis outlined below and asks that the deciding official consider our more thoughtful and complete analysis. Even a casual observer will note that our analysis is far better than what was provided in the NOPR.

### Douglas Factor A

**"The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional, technical, or inadvertent, or was committed maliciously of for gain, or was frequently repeated."**

13

Ms. Hahn did not intentionally misuse her travel card. She relied on misleading advice
provided to her by the card issuer. Her misuse was inadvertent. Her misuse was not
malicious.

Given the many responsibilities that EPA employees must fulfill, one has to wonder why
personal use of the travel card is ranked so much higher than other offenses. For
example, the Agency makes absolutely no effort to determine whether employees, who
are driving government vehicles, or vehicles rented for official travel, are driving safely.
Clearly the consequences of misuse of such government property through unsafe driving
is much more serious, has the potential to cause far more harm to the Agency, employees
and the public yet the Agency spends no resources on monitoring that activity which is
much more serious.  Instead, the Agency would have us believe that misuse of a travel
card is more serious misconduct warranting removal.  It is hard to characterize what Ms.
Hahn did as serious given that it harmed no one besides Ms. Hahn.

The Agency also fails to consider whether the alleged offenses were committed
maliciously or for gain.  Ms. Hahn did not commit the offenses maliciously or for gain.
When Ms. Hahn used the travel card she did not really "gain" anything and the Agency
has not shown he gained anything.

The Agency tries to claim that "If you cannot be relied on to use the GTC as intended,
alternatives must be found to finance your travel arrangements or others must be sent on
travel assignments in your place."  However, unauthorized use of the card does not
impact Ms. Hahn's ability to travel for the Agency unless the Agency chooses to limit
Ms. Hahn's already limited amount of official travel.  Ms. Hahn should not be penalized
because the Agency may elect to deny Ms. Hahn approval to travel or because the
Agency takes away the travel card.

The Agency is not required to take away Ms. Hahn's travel card but if it makes that
decision and takes that step then there are other options that pose no great burden on the
Agency.  In any case, the issue of alternatives and their cost is not relevant to Douglas
Factor A.

Regarding the issue of intoxication, Ms. Hahn was not intoxicated on March 6, 2008, and
the evidence does not support management's bare assertion that Ms. Hahn was
intoxicated. There are many other, more reasonable, explanations for Ms. Hahn's
conduct on March 6 but the Agency has chosen to focus on the one wrong reason that
justifies a disciplinary action.  Ms. Hahn had no intention of appearing intoxicated on
March 6, she was not malicious in any way and she did not do anything related to this
matter for gain.

Regarding the claim that Ms. Hahn was AWOL, the Agency is aware that forced AWOL
is not an offense that should merit discipline. The Agency forced Ms. Hahn onto AWOL
status. Ms. Hahn did not refuse to work, she had no plans to leave early on March 6, and
she followed the directions of her supervisor through the normal end of her working day
which ended at 5:30 PM.  Ms. Hahn had no intent to be AWOL or on any form of leave

14

on March 6, 2008.

**Douglas Factor B**

**"The employee's job level and type of employment, including any fiduciary role, contact with the public, and/or prominence of the position."**

The Agency's states that Ms. Hahn's behavior has caused the supervisor to lose confidence and trust in her judgment.   However, that is not a proper consideration under this factor.   In addition, had the supervisor properly considered the full facts we have presented in this response he would realize that his lack of confidence and trust is wrong because it was based on an incorrect assessment of the situation.

**Douglas Factor C**

**"The employee's past disciplinary record."**

The Agency has taken a number of disciplinary actions against Ms. Hahn over the past year or so.  The most recent action, a suspension, was based on an incident that occurred on May 22, 2007.  The Agency largely ignored the Union's and Ms. Hahn's response to that incident.  Just as is the case of the March 6, 2008, incident, the Agency persists on misclassifying Ms. Hahn's behavior as being due to alcohol and ignores other reasons that are much more likely.

We request that the deciding official revisit the response that Ms. Hahn and her representatives filed in response to the Agency's Notice of Proposed Suspension in relation to the May 22, 2007, incident.   We also add, as attachment 2 to this response, a copy of a document that was not available at the time we responded to the Notice of Proposed Suspension in that case.  The document confirms Ms. Hahn's assertion, at the time, that she had a broken rib.   This new information confirms our assertion that it was due to her broken rib that she was in considerable pain and on prescription pain killers. The Agency may feel her conduct was inappropriate for a person who was "normal" but her conduct is much more forgivable when you consider the fact that she was suffering from the pain of a broken rib on May 22, 2007, and not all individuals react rationally to such a level of pain.

The Agency also relies, too heavily, on a mere referral to the EPA as if that is a magic solution to every problem.   It is not sufficient for a manager to merely refer an employee to the EAP.  Mr. Swenson had many other steps he could have taken to help Ms. Hahn address the behaviors that he found so inappropriate.  He took none of those steps.

The only steps Mr. Swenson appears to have taken are to document Ms. Hahn's conduct. While the Union and Ms. Hahn do not expect Mr. Swenson to babysit Ms. Hahn, we do believe he is required, by Agency policy, to take constructive corrective actions.  The actions Mr. Swenson took in the past against Ms. Hahn have all been destructive actions. He repeatedly punishes her but does not follow agency policy and take constructive

actions.

**Douglas Factor D**

**"The employee's past work record, including length of service, job performance, ability to get along with fellow workers, and dependability."**

The Agency admits Ms. Hahn's work performance has been assessed as satisfactory. The Agency claims that Ms. Hahn's rapport with coworkers is uneven but that is not reflected in her performance appraisals. Since her performance has always been rated as fully successful or the equivalent, the deciding official should disregard all other anecdotal criticisms of her relationships or dependability.

**Douglas Factor E**

**"Any effect of the offense upon the employee's ability to perform at a fully successful level and its effect upon the supervisor's confidence in the employee's ability to perform assigned duties."**

The performance rating the employee received for 2007 was "fully successful". Even today, despite the alleged misconduct, the employee has not been found to be performing at a level of less than fully successful. Clearly the alleged offenses have not caused a decline in Ms. Hahn's performance. There is no basis for the supervisor to claim he does not have confidence in the employee's ability to perform assigned duties.

**Douglas Factor F**

**"Consistency of the penalty with those imposed upon other employees for the same or similar offenses."**

Regarding Douglas factor F, the Agency completely fails to indicate it performed any analysis of whether the penalty it is proposing for Ms. Hahn is consistent with penalties imposed in the past upon other employees for the same or similar offenses. In addition, because the Agency does not keep records of all of the instances when it takes no action against employees for violations of the Code of Conduct and Discipline, its records contain only disciplinary actions and that routinely skews the comparison of any new case to the more serious cases that took place in the past.

As will be discussed in greater detail below, under Douglas Factor G, the penalty the Agency is proposing for Ms. Hahn is far harsher than the Agency has imposed on employees who committed much more severe misconduct. The Office of Inspector General has conducted an investigation of some of the disciplinary actions taken by the Agency against employees who committed such offenses as using a credit card stolen from another Federal agency for personal use, for participating in a food stamp trafficking ring, and for committing bank fraud, yet the penalties for those offenses ranged from oral reprimands to 14 days suspensions. The penalty being proposed for the

16

far less serious conduct committed by Ms. Hahn is grossly disproportionate to the discipline taken against employees who engaged in far more serious misconduct. The penalty being imposed on Ms. Hahn is arbitrary and capricious when compared to penalties imposed on other employees for more serious offenses.

## Douglas Factor G

### "Consistency of the penalty with penalties in the Agency's conduct and discipline order"

The proposing official has claimed that Ms. Hahn misuse of the travel card is ground for misuse independent of the other charges. As noted previously, the Agency has chosen to claim that the offense involving credit card misuse is comparable to offense #11 and the Union disagrees with that claim. Offense #11 was clearly intended to apply to property related offenses and neither the travel card nor its line of credit are "property" belonging to the Federal government. The card and line of credit are solely the property of Ms. Hahn.

As the Union has previously pointed out, the Order on Conduct and Discipline was prepared at a time when travel cards did not exist and there is no evidence that the Agency intended that travel card misuse be categorized as Offense #11. Use of real government property is much different because the use of the property often diminishes its value or damages the property. That is why the value of the property is something that must be considered in connection with determining the appropriate disciplinary action to take for misuse of government property.

Although no offense in the Order on Conduct and Discipline fits the conduct Ms. Hahn's is accused of committing in connection with the travel card, under the worst case interpretation of the Order on Conduct and Discipline, such conduct fits better under offense #22 "Negligent performance of duties – where damage or waste to government property is insubstantial." Culpable negligence in the performance of official duties is a failure to exercise the degree of care required under the particular circumstances, which a person of ordinary prudence in the same situation and with equal experience would not omit. What she did cost the Agency nothing and had no impact on Agency operations.

Charging Ms. Hahn with violating offense #11 is not consistent with the table of penalties in the Agency Order on Conduct and Discipline.

The remaining charges consist of forced AWOL which is not a punishable offense and the unproven allegation that she was under the influence of alcohol during working hours. Because Mr. Swenson forced Ms. Hahn to ride with him to her home, she was merely following the direction of her supervisor. Ms. Hahn never intended to leave work early on March 6, 2008. She should not be disciplined for being with her supervisor during working hours. However, if the Agency maintains that Ms. Hahn was AWOL during those hours then she was not at work and could not be under the influence of alcohol during working hours. Ms. Hahn was not under the influence of alcohol during working

hours on March 6, 2008. The only evidence that the Agency presents concerning this issue is the speculation of an employee that Ms. Hahn may have smelled of alcohol from the night before. That is hardly sufficient grounds upon which to end an employees long career and to deprive the employee of her source of income.

It should also be noted that the Agency has not consistently followed its table of penalties in past cases. Unlike Ms. Hahn's case, the Agency does not typically choose the most severe penalty when disciplining an employee for misconduct. As noted in the Office of Inspector General Report No. 2007-M-00003, the Agency generally does not take disciplinary actions as severe as those listed in the table of penalties. For example, an employee who pled guilty in court to using a credit card stolen from another Federal agency for personal purchases received only a letter of reprimand. Another employee participated in a food stamp trafficking scheme and received an oral reprimand. Another employee pled guilty to bank fraud and was sentenced to time in jail and 5 years probation but only received a 14 days suspension. Another employee was found to have fraudulently purchased computer equipment during a 10 year period and could not account for the purchased equipment yet the employee received only an official reprimand.

The actions described above were far worse than what Ms. Hahn is accused of doing yet none of the accused employees described above were fired or forced to suffer a lengthy suspension. It is clear that the Agency is not implementing the Order on Conduct and Discipline in Ms. Hahn's case consistent with how it has implemented it in cases that involved far more serious misconduct.

**Douglas Factor H**

**"The notoriety of the offense or its impact upon the reputation of the Agency"**

The Agency has made no claim that what Ms. Hahn did was notorious or had any impact upon the reputation of the Agency. In other cases where the notoriety of the offense was significant, the Agency did not fire employees.

**Douglas Factor I**

**"The clarity with which the employee was on notice of any rules that were violated in committing the offense."**

Regarding Douglas factor I, the Agency completely failed to discuss the clarity with which Ms. Hahn was on notice regarding the Agency's position that misuse of a travel card is offense #11 in the Agency Order on Conduct and Discipline. The fact that the Regional Comptroller offered training is not adequate notice.

No reasonable person would intuitively expect that merely using a travel card for personal use would be considered so serious to EPA that it merited being fired. The Agency has not put employees on notice that it views credit card misuse as being more

serious that numerous other types of misconduct that common sense would suggest are much more serious.

## Douglas Factor J

### "Potential for the employee's rehabilitation"

The proposing official and the secret tribunal made many mistakes but their most egregious error was in their failure to properly assess the potential for Ms. Hahn's rehabilitation. The Agency looked solely at Ms. Hahn's past record of misconduct and takes the position that because the Agency's past approach to responding to Ms. Hahn's misconduct was unsuccessful in solving the problem then Ms. Hahn must be fired. What the Agency ignores is the fact that a big part of the reason why past disciplinary efforts failed is that they were not the appropriate solution for the problem.

The Agency's policy is that "primary emphasis be placed on preventing situations requiring disciplinary actions through effective employee-management relations and that when work performance and/or conduct are not maintained at an acceptable levels, constructive corrective action will be taken by responsible supervisors on a timely basis." The Agency's approach to Ms. Hahn has been to marginalize her and stigmatize her in the eyes of her coworkers. The Agency placed primary emphasis on punitive, after the fact, measures which were clearly not successful. Rather than change course and refocus on preventative measures, the Agency instead turned only to ever higher punitive measures. The Agency did not offer training or anything than a referral to an outside party, the EAP.

The Agency did not follow the policy and did not utilize constructive corrective action but, instead, focused on destructive corrective actions.

Ms. Hahn certainly has the potential for rehabilitation and is committed to doing better in the future even if her supervisor fails in his responsibility to focus emphasis on constructive corrective actions.

The Agency claims that Ms. Hahn has, in the past, denied or minimized offenses and continue to do so (at the present time). That statement is not entirely correct. Ms. Hahn did not minimize the alleged offenses that led to her 7 day suspension in 2007. Ms. Hahn served her suspension without filing a grievance or any other action to fight back against that disciplinary action. It is completely unfair to claim that Ms. Hahn has continued to minimize conduct related charges. She has taken such charges seriously and is committed to overcoming any problems that lead to such charges.

## Douglas Factor K

### "Aggravating or mitigating factors surround(ing) the offense, such as unusual job tensions, personality problems, mental impairment, or bad faith, malice or provocation on the part of others involved in the matter."

The proposing official and the secret tribunal failed to meet their responsibility to address this Douglas Factor. Although the NOPR notes Ms. Hahn work record, it fails to mention any of the mitigating factors in Douglas Factor K that were described earlier in this response. Certainly there were unusual job tensions on March 6 that applied to both Ms. Hahn and Mr. Swenson. In addition to those tensions, there are other mitigating factors that should be considered including the following:

- Bad faith – As noted above, the Agency policy is supposed to be that managers will focus on preventing situations that require discipline and when discipline is needed the Agency will focus on constructive corrective actions. The managers who were involved did not make a good faith effort to focus on preventative measures that worked. Instead, time after time they returned to suspensions that were not successful in preventing recurrence of the misconduct. The Agency, from the beginning, should have focused on more constructive solutions that were readily at hand. The only tool in Mr. Swenson's corrective action tool box is a hammer that he used repeatedly. He should have used other tools that are more constructive such a reward and recognition. Certainly, after the first suspension failed, the Agency should have turned to constructive measures to assist Ms. Hahn. Relying solely on a dismissive referral to the EAP is not an acceptable constructive corrective action.

- Provocation – Clearly the almost constant monitoring of Ms. Hahn's time and activities, no matter how reasonable it may seem to Mr. Swenson, is a provocation for an employee already suffering from stress and other physical illnesses.

- Bad Faith - The failure of management to promptly review travel card records and detect Ms. Hahn's misuse before it reached a level that management feels warranted firing Ms. Hahn is a mitigating factor due to the Agency's bad faith in administering its obligations under the Agency travel card policy. Certainly the discipline ought to be mitigated because the Agency had an obligation to review and act on monthly reports showing misuse and failed to do so on a routine basis. Had the Agency followed its own policy, it would have taken action when the misuse was at a much lower level. By waiting to carry out its obligations, the Agency was an enabler and showed bad faith.

- Personality Problems – Ms. Hahn has consulted the EAP and has consulted private medical advisors and that process has not yet been carried out to completion. Ms. Hahn is still under a doctor's care and that, hopefully, will lead to an improvement in her situation.

- Medical Problems – Ms. Hahn had accidentally taken a double dose of a prescription medication designed to reduce her blood sugar level. The effect of the medication, along with the impact of stress, caused Ms. Hahn's blood sugar level to drop to a point that impacted her conduct and behavior.

The factors listed above should result in a very significant mitigation of the proposed discipline.

**Douglas Factor L**

**"The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others."**

The Agency has the ability to use a number of alternative sanctions. It could turn off Ms. Hahn's travel card when she is not on travel. It could waive the requirement to have and use a travel card. . Despite having a travel card for some time, Ms. Hahn's misuse did not occur until last fall when she was given misleading or incorrect advice from representatives of the card issuer. The Agency has other alternative sanctions they can employ such as waiving the requirement to use the travel card and allowing the employee to use his or her personal credit card for travel.

Such alternatives are effective deterrents because they prevent misconduct.

Although the Union does not feel that Ms. Hahn was AWOL on March 6, 2008, the Agency has a number of alternative sanctions to deal with a genuine AWOL issue. The use of a time clock for a limited period of time would quickly reveal if there is a true AWOL problem and might deter AWOL of the type that is described in the NOPR. The Agency can also better recognize improvements in an employee's time and attendance. A little encouragement and support can go a long way toward resolving many alleged time and attendance issues.

Regarding the allegation that Ms. Hahn was under the influence of alcohol, it is notable that the Agency did not order any drug or alcohol testing despite its alleged belief that Ms. Hahn was under the influence of alcohol.

The Agency's NOPR fails to discuss these alternative sanctions and that means it did not conduct a proper Douglas Factors analysis.

## V. Conclusion

Ms. Hahn has expressed his complete regret and remorse for what has happened and has apologized profusely for her conduct. Nothing is gained if Ms. Hahn is fired. The Agency loses an enormous investment and a talented employee who has much to offer if she is not marginalized. Coworkers will be forced to take on extra work just to make up for the loss of Ms. Hahn.

Ms. Hahn has always been completely cooperative in every investigation and inquiry into her conduct. While she has done his part in terms of cooperation, his supervisor and the proposing official did not do their parts under Agency policy.

The Agency's decision to make Ms.Hahn's travel card misuse a firing offense is an arbitrary and capricious decision that is not supported by the Agency Order on Conduct and Discipline and is not consistent with how the Agency has treated employees who engaged in misconduct that is much more serious.

21

There are alternative sanctions that the Agency has not even thought about, considered or tried. Ms. Hahn's travel card issue could be solved easily. The alleged AWOL issue is not so significant that it cannot be corrected through constructive procedures that work. The alleged alcohol related concerns can also be addressed in a number of ways that do not require that Ms. Hahn be fired. We urge the deciding official to follow the Agency's policy and direct Ms. Hahn's managers to place primary emphasis on preventing problems by engaging in an effective employee-management relationship that uses constructive corrective actions instead of destructive corrective actions.


cc: AFGE Local 704

EXHIBIT C



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

**WASHINGTON, D.C. 20460**

**OFFICE OF
CIVIL RIGHTS**

# NOTICE OF FINAL INTERVIEW
# AND
# RIGHT TO FILE A DISCRIMINATION COMPLAINT

June 5, 2008

SUBJECT:   Notice of Final Interview

FROM :      Oliver Warnsley
                 EEO Counselor

         TO:  Eloise Hahn

On the date shown above the final counseling interview was held in connection with the allegation(s) you brought to my attention: whether you were discriminated against based on Age, color, disability, race national origin, marital status, religion, and sexual harassment, when on May 2, 2008 you were given Notice of Proposed Removal memorandum by your supervisor. Your initial counseling interview was conducted on May 8, 2008

This is to inform you that because the dispute you brought to my attention has not been resolved to your satisfaction, you are now entitled to file an individual or class-action discrimination complaint based on Race, Color, National Origin, Sex, Disability, Religion, Age, or Retaliation. If you decide to file a discrimination complaint, it must be in writing, signed, and filed **within fifteen (15) calendar days** after receipt of this notice.

To facilitate the filing of your discrimination complaint I would recommend using the attached discrimination complaint form. Also remember you cannot file a discrimination complaint on any bases or issues not discussed during counseling. If you add bases or issues for which you were not counseled they may be dismissed or you will be referred for further counseling.

The discrimination complaint should state whether or not you filed a grievance under a negotiated grievance procedure or an appeal to the Merit Systems Protection Board on the same bases and issues. Include the dates and status of such actions. This information is necessary for the Agency to

determine whether or not your discrimination complaint complies with the regulations at 29 C. F. R. Part 1614.

If you decide to file a discrimination complaint, mail the complaint form to:

> U.S. Environmental Protection Agency
> Office of Civil Rights (1201A)
> Employment Complaints Resolution Staff
> Room 2450 Ariel Rios North Building
> 1200 Pennsylvania Avenue, NW
> Washington, DC 20460.

A discrimination complaint shall be deemed timely if it is received or postmarked before the expiration of the 15-day filing period, or, in the absence of a legible postmark, if it is received by mail within five days of the expiration of the filing period.

If you retain an attorney or any other person to represent you, you or your representative must immediately notify, in writing, the Office of Civil Rights. You and your representative will receive a written acknowledgment of your discrimination complaint from the appropriate agency official.

If you file a discrimination complaint, you should name Stephen L. Johnson, Administrator.

### ACKNOWLEDGMENT OF RECEIPT

**Hand Receipt**

_____                    Date    _June 5, 2008_
**Signature of Aggrieved Individual**


Attachment: Complaint Form



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

**WASHINGTON, D.C. 20460**

OFFICE OF
CIVIL RIGHTS

| **COMPLAINT OF DISCRIMINATION IN THE FEDERAL GOVERNMENT** BECAUSE OF **RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, DISABILITY, OR RETALIATION** *(Please type or print)* | **(FOR AGENCY USE)** |
|---|---|

| 1. YOUR (COMPLAINANT'S) FULL NAME: Eloise Kathleen Hah n | 2. WHAT IS YOUR TELEPHONE NUMBER INCLUDING AREA CODE? HOME PHONE: (708) 484-2169 |
|---|---|

| STREET ADDRESS (OR POST OFFICE BOX NUMBER) 1631 S. Clarence Av; Apt. 1 | WORK PHONE: (312) 886-6785 |
|---|---|

| CITY Berwyn | STATE IL | ZIP CODE 60402 | 4. ARE YOU NOW WORKING FOR THE FEDERAL GOVERNMENT? ☐ YES (ANSWER A, B, C AND D BELOW) ☐ NO (CONTINUE WITH QUESTION 5) |
|---|---|---|---|

| 3. WHICH FEDERAL OFFICE DO YOU BELIEVE DISCRIMINATED AGAINST YOU? *(Prepare a separate complaint form for each office.)* Water Division | A. NAME OF AGENCY WHERE YOU WORK: US EPA Region 5 |
|---|---|

| A. NAME OF OFFICE WHICH YOU BELIEVE DISCRIMINATED AGAINST YOU: NPDES Programs Branch | B. STREET ADDRESS OF YOUR AGENCY:d 77 W. Jackson Blvd.; Mail Code WN-16J |
|---|---|

| B. STREET ADDRESS OF OFFICE: 77 W. Javkson Blvd., | C. CITY Chicago | STATE IL | ZIP CODE 60604 |
|---|---|---|---|

| C. CITY Chicago | STATE IlL | ZIP CODE 60604 | D. WHAT IS THE TITLE, SERIES, AND GRADE OF YOUR JOB? GS-819, GS-12, Step 8; Environmental Engineer |
|---|---|---|---|

| 5. DATE ON WHICH MOST RECENT ALLEGED DISCRIMINATION TOOK PLACE: MONTH: 05   DAY:02   YEAR: 2008 | 6. NAME AND ADDRESS OF REPRESENTATIVE: Requesting court appointed attorney |
|---|---|

7. CHECK BELOW WHY YOU BELIEVE YOU WERE DISCRIMINATED AGAINST, BECAUSE OF YOUR:

☐ RACE, IF SO, STATE YOUR RACE _____
☐ COLOR, IF SO, STATE YOUR COLOR _____
☐ RELIGION, IF SO, STATE YOUR RELIGION _____
☒ SEX, IF SO, STATE YOUR SEX _____Female_____
☒ NATIONAL ORIGIN, IF SO, STATE YOUR NATIONAL ORIGIN_____Germanic_____
☒ AGE, IF SO, STATE YOUR DATE OF BIRTH ___03/07/54___
☒ DISABILITY, IF SO, STATE YOUR DISABILITY_____Diabetic_____

☒ RETALIATION, IF SO, STATE YOUR CHARGE____Advised supv of EEOC Complaint and he prepared Proposal for Removal on May 2, 2008
*(Complaints of discrimination because of age apply only to employees or applicants who are at least 40 years of age at the time of the alleged discriminatory actions.)*

| 8. EXPLAIN HOW YOU BELIEVE YOU WERE DISCRIMINATED AGAINST (TREATED DIFFERENTLY FROM OTHER EMPLOYEES OR APPLICANTS) BECAUSE OF YOUR RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, DISABILITY, OR RETALIATION. *(For each allegation, please state to the best of your knowledge, information and belief what incident occurred and when the incident occurred. Use a separate sheet of paper and attach to the Complaint form.)* (SEE ATTACHED) |
|---|

| 9(a). I HAVE DISCUSSED MY COMPLAINT WITH AN EQUAL EMPLOYMENT OPPORTUNITY COUNSELOR: ☒ YES   ☐ NO | 9(b). NAME OF COUNSELOR:\ Oliver Warnsley |
|---|---|

| 10. WHAT CORRECTIVE ACTION ARE YOU SEEKING? *(If additional space is needed, use separate sheet.)* Retainment of employment or in the alternative a pension with medical and life insurance privileges. Additionally all adverse employment records be expunged from my file. |
|---|

| 11. DATE OF THIS COMPLAINT 0 5 | 0 5 | 0 5 | 12. SIGN YOUR (COMPLAINANT'S) NAME HERE: |
|---|---|---|---|



# UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

## WASHINGTON, D.C. 20460

OFFICE OF
CIVIL RIGHTS

DISCRIMINATION COMPLAINT FORM

EXPLANATION FOR QUESTION # 8

I am the only licensed female engineer in the NPDES Programs Branch. I am also one of the oldest female licensed engineers in the Agency. I am not treated fairly with flexi-place, nor with leave privileges. Recently the supv., Peter Swenson hired 3 new females to replace me since he does not like my personality. I have always done a good job for the Agency and have passed fully successful.

It appears the co-workers are somewhat jealous of me and complain about the slightest thing, i.e., receiving a phone call from a family member for health or death reasons.

My baby now age 17 has recently been diagnosed with fibroid cysts in both of her ovaries. I am assuming I will need to take off from work without pay. Most likely our phone, electric, gas, water and garbage services will be curtailed due to a negative check balance. I have incurred approximately $1,600 in overdraft fees from my bank since March 2008. I don't know how I will be able to save my daughter's life without insurance, monetary funds, etc.

At this time I request the court to Stay the Termination until the jury trial is completed. I also request no more harassment and/or sexual harassment in the workplace, ability to use the restroom without applying for leave, access to my blood sugar kit without being AWOL, non-equal pay, and advanced leave with discretion .

I have also been asked why I never kept my marriage name instead of a German name being "Hahn". Staff members salute me as if I am a Nazi soldier. I have also been falsely arrested last year where I was suffering from a broken rib and was thrown in the IRS jail instead of receiving immediate medical treatment.

I also request a settlement of $2,200,000 million dollars or a permanent pension in excess of $4,000 per month after taxes and insurance costs have beeen deducted from the pay.

EXPLANATION FOR QUESTION # 10

## United States District Court, Northern District of Illinois

COPY

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 08 C 2333 | **DATE** | 5/15/2008 |
| **CASE TITLE** | Eloise Huhn, et al vs. US EPA Region, et al | | |

**DOCKET ENTRY TEXT**

Status hearing held on 5/15/2008. For the reasons stated on the record, this action is dismissed without prejudice to refiling after receiving the right to sue letter.

*[signature] David H. Coar*

Docketing to mail notices.

00:02

F I L E D

MAY 1 5 2008

Judge David H. Coar
United States District Court

| | | Courtroom Deputy Initials: | PAMF |
|---|---|---|---|
| | | | |

**EXHIBIT D**





### Supervisor's Statement
In Connection With Disability Retirement Under the Civil Service Retirement System
and the Federal Employees Retirement System
**This form should be completed by the immediate supervisor
or someone who is in a position to observe the applicant on a regular basis.**

Civil Service
Retirement System

Federal Employees
Retirement System

Form Approved:
OMB No. 3206-0228

*All sections of this form must be completed properly.
Failure to do so will delay the processing of the disability
application at OPM.*

The employee identified in Section A has indicated that he or
she intends to apply for disability retirement. The applicant's
signature on the "Applicant's Statement" authorizes his or her
immediate supervisor (or a supervisor who was and is in a
position to observe the applicant on a regular basis) to provide
the information and documentation requested. The immediate
supervisor is asked to provide information about the applicant's
job, performance, attendance, and conduct.

*If you need more space in any section, attach a separate sheet
and indicate that an attachment is provided.*

The following definitions apply to the terms used in the
Supervisor's Statement.

- "Less than fully successful performance" means performance
  of an employee which fails to meet established performance
  standards in one or more critical elements of the employee's
  position or the equivalent level for a position not under CFR
  430.

- "Critical element" means a component of an employee's job
  that is of sufficient importance that performing below the
  minimum standard established by management requires
  remedial action, such as denial of within-grade increase, and
  may be the basis for reducing the grade level or removing the
  employee.

- "Unacceptable attendance" means absence from work which is
  too frequent, unpredictable, or lengthy to allow the job to be
  done.

- "Unsatisfactory conduct" means conduct for which an
  employee may be removed or disciplined for cause under
  adverse action procedures. (For example, discourteous conduct
  to the public, behavior which poses a threat to the life, health,
  safety, or well-being of co-workers, subordinates, or the
  public.)

- "Accommodation" means an adjustment made to a job and/or
  work environment that enables a qualified handicapped person
  to perform the duties of that position. Reasonable accommo-
  dation may include modifying the worksite, adjusting the work
  schedule, restructuring the job, acquiring or modifying
  equipment or devices, providing interpreters, readers or
  personal assistants, and reassigning or retraining employees.

- "5 CFR 531.409(d)" is the regulation that provides for a
  waiver of the requirements for determination of an employee's
  level of competence in certain cases when the employee was in
  duty status for less than 60 days during the 52 calendar weeks
  before a within-grade increase would be due.

After completing and certifying this form and attaching the
appropriate documentation, you should return the original to the
employee or to your personnel office according to instructions and
practices in your agency. In either case, *a copy must be given to
the employee*. Please *do not* send the form directly to OPM unless
OPM specifically requested you to do so.

If necessary, you may be contacted by OPM for additional
information or clarification.

| 1. Name *(last, first, middle)*<br><br>Hahn, Eloise K. | 2. Date of birth *(mo./day/yr.)*<br><br>03/07/1954 | 3. Social security number<br><br>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 |
|---|---|---|

| 1. Title of position of record. *(Attach a copy of position description and current performance standards. If available, attach a copy of the latest performance appraisal.)*<br><br>Environmental Engineer | 2. Date of entry into position *(mo./day/yr.)*<br><br>6/5/85 |
|---|---|

3. Is performance less than fully successful in any critical element of position?

☐ Yes, complete items 4 - 6 of this section.          ☑ No, go to Section C.

| 4. Show the approximate date *(mo./yr.)* that unacceptable performance or the inability to do the job began. | 5. Has employee received, after the date in item 4, a within-grade step or an award based on performance of a critical element? | | 5a. Was within-grade increase granted under 5 CFR 531.409 (d)? *(see instructions)* |
|---|---|---|---|
| | ☐ Yes<br>☐ No | Period the increase or award covered.<br>From *(mo./yr.)*         To *(mo./yr.)* | ☐ Yes         ☐ No |

3112-101
U.S. Office of Personnel Management
CSRS/FERS Handbook for Personnel and Payroll Offices

**Duplicate - Employee's Copy**

Standard Form 3112B
December 1995
This form supersedes Standard Forms 2824B & 3105B

6. Identify any critical element(s) of the position which employee does not perform successfully or at all. Explain the deficiencies you observed. Attach supporting documentation such as notice to the employee that performance is less than fully successful or physician's recommendation regarding medical restrictions.

1. Has employee stopped coming to work?
☑ No          ☐ Yes, how long is absence expected to continue *(if known)*?

2. Is employee's attendance unacceptable for continuing in current position?
☑ No          ☐ Yes, attendance stopped or became unacceptable on *(mo./yr.)*:

3. Explain the impact of employee's absence on your work operations.

Employee has used all available leave and has been told that no additional advance leave will be granted

4. How many hours of leave has employee used for apparent medical reasons since date in item C2? *(Attach copies of medical information on which you based your decision to approve leave, leave records, records of contact with or notices to employee. Include as much information as possible about specific reasons for leave use.)*

| | Enter Leave Hours Used | Annual | Sick | LWOP |
|---|---|---|---|---|
| | | | | |

1. Is employee's conduct unsatisfactory?
☐ No, go to Section E.          ☑ Yes, conduct became unsatisfactory on *(mo./yr.)*:   Feb 2006

2. Describe how conduct is unsatisfactory *(attach supporting documentation, such as notice to employee of proposed adverse action).*
Time and attendance problems, misuse of government equipment, reporting to work under the influence of alcohol.
In Aug 2007 she received a 2-week suspension

1. What efforts have been made to accommodate the employee in current position?
Employee has been referred to EAP, and has occasionally taken advantage of the services.

2. Has employee been reassigned to a new permanent position? *(If yes, to what position and when?)*
☑ No          ☐ Yes, to          on *(mo./yr.)*:

3. Has employee been reassigned to *"light duty"* or a temporary position?
☑ No, go to Section F.          ☐ Yes

4. Describe the reason for temporary nature of assignment and length of time the employee is expected to occupy the position.

1. How long have you supervised the employee?
Since May 2005

2. I certify that all statements made on this Supervisor's Statement are true to the best of my knowledge and belief.

2a. Supervisor's signature
Peter Swenson

2c. Date *(mo./day/yr.)*
4/28/08

2b. Supervisor's name *(type or print legibly)*
Peter Swenson

2d. Supervisor's office mailing address
77 W. Jackson Blvd
Chicago, IL   60604

2e. Supervisor's daytime telephone number *(including area code)*
312-886-0236

3112-101

**EXHIBIT E**

Acct: H60301322  Loc: RAD
Ordered Date: 05/14/2007
Exam Date: 05/14/2007 Status: REG REF
Unit No: H1209632
Patient Phone No: 708-484-2169

## RESULT

TYPE/EXAM
RAD/RIBS LEFT

CAL HISTORY: Pain, trauma December 2006

ARISON STUDY: Best August 16, 2006

INGS: There are four views of the left ribcage with a
tional PA view of the chest. The study shows a nondisplaced
 fracture of the lateral aspect of the eighth rib.
chest may demonstrates mild cardiomegaly may

SSION:
ute fracture left 8th rib.
rdiomegaly.

nt: The patients physician was made aware of these findings
 p.m. on the day's study was obtained.

            ** REPORT SIGNATURE ON FILE 05/14/07 **
            Reported By:  JOHN V. COURTNEY, M.D.
            Signed By:    JOHN V. COURTNEY, M.D.

            --------------------------------
            Reported By: JOHN V. COURTNEY, M.D.

O,YILI, MD

logist: SUSAN M. HOEFLINGER
m Date/Time: 05/14/2007 (1440)
n Date: 05/14/2007
bed Date/Time: 05/14/2007 (2001)
ptionist: CC-ROBOT
 Date/Time: 07/24/2007 (1017)

            Signed Report



TOTAL P.02

Phone: 708.484.2169

**Northwestern Memorial Hospital**

# AUTHORIZATION FOR RELEASE OF INFORMATION

Records to be released from:

☒ **Northwestern Memorial Hospital**
251 East Huron Street
M-702
Chicago, Illinois 60611-2908
Phone: 312-926-3248
Fax: 312-926-3093

☐ **Northwestern Memorial Physician Group (NMPG)**
680 N Lake Shore Dr
Suite 818
Chicago, Illinois 60611-2908
Phone: 312-926-3627

☐ **HOLD FOR PICK-UP**

Please mail authorization form to the appropriate address listed above

If records to be released are prior to 1974, please indicate hospital:
☐ Passavant Memorial Hospital
☐ Wesley Memorial Hospital

Print Patient's Name ___Eloise Kud___

Address __163 S. Clarence Av__ City/State/Zip __Berwyn, IL 60402__

Date of Birth __03/07/54__ Last 4 digits of SSN __890__ Phone (W) __408-5266__

I ___Eloise Kruk___ hereby authorize Northwestern Memorial HealthCare

to release (written/oral/electronic) information to:

Agency/Facility/Person __USDept of Labor Lawrence__ Not to

Address __9 N Robson Blud__ City/State/Zip __Chicago, IL 60604__ employer

**INFORMATION TO BE RELEASED**

| ☐ Discharge Summary | ☐ Operative Reports | ☐ Pathology Reports | ☒ Radiology Reports |
|---|---|---|---|
| ☒ Radiology Images* *Please contact Radiology 312.926.5160 Or Mail to: Above address + Radiology Rm 4-712 | ☐ Slides*** ***Please contact Pathology Department 312.926.3211 | ☐ Clinic/Office Records** **Please contact your Physician's Office directly | ☒ Psychological testing/assessment |
| ☐ Treatment Planning Form | ☒ Consultations | ☐ Integrated Assessment | ☒ Lab Reports |

☒ Record Abstract (History and Physical; Progress Notes, Lab, Radiology, Operative Report, Pathology Report, Consultation Report and other diagnostic tests)

☒ Patient review of record

☒ Other (Please specify)
___Please send one copy to patient ~~and one to employer~~___

Concerning the care of the above patient from dates __5-22-07__ to __5-22-07__

(Please see other side)

RECEIVED JUN 15 2007 BY:_____